**UNITED MEDICAL LABORATORIES, INC., Appellant,**

v.

**COLUMBIA BROADCASTING SYSTEM, INC., et al., Appellees.**

No. 21446.

United States Court of Appeals Ninth Circuit.

Nov. 18, 1968.

Certiorari Denied March 24, 1969.

See 89 S.Ct. 1197.

Roland Banks, Jr., of Mautz, Souther, Spaulding, Kinsey & Williamson, Portland, Or., for appellant.

Cleveland C. Cory, of Davies, Biggs, Strayer, Stoel & Boley, Portland, Or., for Columbia Broadcasting System, Inc.

Before CHAMBERS, Chief Judge, and JOHNSEN* and KOELSCH, Circuit Judges.

JOHNSEN, Circuit Judge.

The District Court dismissed on summary judgment, 258 F.Supp. 735, an action in diversity jurisdiction for a claim of libel under Oregon law. We affirm the judgment, but upon another ground than those on which the court predicated its decision.

As involved here, the defamation claim was one asserted by United Medical Laboratories, Inc., (herein United Labs), a mail order clinical testing laboratory, of Portland, Oregon, against Columbia Broadcasting System, Inc., Walter Cronkite, one of its featured newscasters and commentators, and Jay McMullen, one of its producers, (herein collectively CBS).

The basis of the claim was a series of national television broadcasts, radio broadcasts and press releases engaged in by CBS—each three in number—primarily reporting on the inaccuracies in the results of some tests of clinical specimens which CBS had had made, through some cooperating physicians, by 22 mail order laboratories throughout the country, and commenting on the significance of the inaccuracies as questions of risk to personal health and lack of public regulation.[1]

The publications gave individual identification to only one of the laboratories by which the tests had been performed, but a map was used on one of the telecasts to indicate the various states in which the laboratories involved were located. This map showed that none of those making the tests was located in Oregon.

United Labs claimed, however, to have been libeled by the publications in that, allegedly, the reports and comments had conveyed and were meant to convey the implication and understanding that the testing inaccuracies which had occurred were typical of all mail order laboratories—a fact which United Labs asserted was not true and was specifically false as to it. It further contended that in view of its prominence as one of the largest mail-order laboratories in the United States (with "more than 4,000 doctors, numerous medical schools, and a number of national drug companies" as clients,

---

* Harvey M. Johnsen, Senior Circuit Judge of the Eighth Circuit, sitting by designation.

1. The three television broadcasts are set out in an Appendix hereto, with the press release made as to the third one being used here (as it was in the record) to show the contents of that broadcast. The other publications, radio and press, are not reproduced because of their substantial identity to the telecasts.

and making "in excess of 500,000 tests per month"), the broadcasts had been professionally regarded, both locally and nationally, as having particular application to it.

In addition, United Labs charged that the publications were intendedly aimed at it; that because of the position which it occupied in the field, CBS had meant and had caused it to be personally subjected "to public scorn, contempt and hatred as an incompetent, inaccurate and cut-rate business which was and is endangering the health and lives of people throughout the United States"; and that in engaging in such untrue defamation against it, in permitting the libel to operate to greatly injure its business and reputation, and in not making any retraction on request, CBS had acted with malice toward it.

Recovery was sought of $5,000,000 in general damages, $100,000 in special damages and $5,000,000 in punitive damages.

The District Court held that the defamation was without any such reference to United Labs, either class or special, as would enable it to maintain a libel action under Oregon law. In substance, the basis of the court's decision was that the publications were on their face so "clearly limited" as to be incapable of having any general reach or reference and as only to cover individually the particular mail-order laboratories which had performed the tests; that they thus were without room for any contention of reference having been intended or of application being reasonably able to attach to other mail order laboratories on a class basis; that United Labs, however, "might still have an action, if it could show special reference to itself; that is, *other* than as a member of a class"; but that as to this aspect its showing in resistance to the motion for summary judgment set out facts and circumstances which were only "very scanty"—such as not to be able in the court's opinion to support any inference of special reference. 258 F.Supp. at 740, 741, 742 and 743.

On our reading of the Oregon cases, we believe that these conclusions accorded too narrow a scope to Oregon libel law, in their views that no such reach legally could exist on the text of the publications as to make it possible for any class reference to be involved against United Labs; and that further no such possible special reference (either by attachment from United Labs' prominence in the field or from any other circumstances in the situation) appeared to be establishable, as could make the injury sustained to United Labs' business and reputation, from application of the publications having in fact been made to it, give rise to a defamation claim.

 Under the Oregon decisions, as well as generally, the question of reference in defamation, whether alleged to exist on a class or a special basis, can sufficiently be a matter of what application actually has been given to the publication by reasonable understanding and belief. See e. g. Marr v. Putnam, 196 Or. 1, 246 P.2d 509, 515, and 213 Or. 17, 321 P.2d 1061, 1065 (second appeal). Also see Restatement, Torts, § 564; Restatement, Torts, Second, Tentative Draft No. 11, § 564A.

 Corollarily, it would follow that such an extent of actual application may occur as to provide substantial probativeness on the reasonableness of the understanding and belief engaged in, and in these circumstances to cause the question of reference generally to become one of fact on all the evidentiary elements involved. In such a situation the question of reference would not, except in special circumstances, be subject to resolution as a matter of law or to disposition on a summary basis.

As to class defamation, however, the courts have engaged in a limitation or exception to this—which has not had and perhaps cannot be given any definitiveness—of cutting off all possible application to a class or group upon the basis that the size thereof, when considered in relation to the nature or circumstances of the defamation, is such as to create legal uncertainty or remoteness, and so

to entitle the publication to be held incapable as a matter of law of being reasonably understood and believed to have reference or attachability to each member of the class or group. See Prosser, Law of Torts, 3rd ed., § 106, pp. 767–769; Restatement, Torts, Second, Tentative Draft No. 11, § 564A, supra. But cf. Fawcett Publications, Inc. v. Morris, Okl., 377 P.2d 42, 51.

We need not, however, consider that question further. The District Court did not dispose of the case upon this basis, and upon the record we would not feel warranted in using that possible aspect here as a means of affirming the judgment, which CBS urges us to do. While there is general showing that large numbers of testing laboratories (apparently thousands) exist throughout the country, the affidavits do not enable it to be said how many, even of those set out in partial general list, are "mail order clinical laboratories" in the sense that the characterizing term "mail order" can be argued to have had aim and been given application from the publications. Thus, numerous community laboratories appear to be included in the partial list, which may permit some mailing of specimens to them in local incident or convenience, but which we are not willing to brand abstractly, in attempted basis to uphold the summary judgment here, as being engaged in the "mail order laboratory business", within the arguable thrust of the publications.

Furthermore, even if the matter of class reference, as a question under Oregon law, had been thus subject to summary disposition, there would still remain the matter of the court's similar disposition of the question of special reference. The showing contained in United Labs' affidavits as to the extent of the application which had in fact occurred against it—clients' and other professional expressions which had been made; $100,000 drop in business volume; lapse of pending business-contract negotiations; etc.—provided such substantial probativeness on the reasonableness of

the understanding and belief which had occurred as in our opinion to require that the question of special reference under Oregon law be at least carried beyond the point of summary judgment.

While we indicated at the start that we were affirming the judgment upon another ground (here a federal one), we have engaged in discussing the District Court's disposition, because we would have chosen to let the termination of this diversity libel litigation stand upon the state basis attempted by the District Court, had we deemed it possible to do so.

The federal question to which we here are resorting for affirmance is one which was considered and discussed by the District Court, 258 F.Supp. at 743–744, as follows:

"Defendants also urge that a forthright discussion of subjects pertaining to 'public health' should be granted the same partial immunity as that granted to a discussion of 'public officials'. Rosenblatt v. Baer, 383 U.S. 75, 86 S.Ct. 669, 15 L.Ed.2d 597 (1966); New York Times Co. v. Sullivan, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686, [95 A.L.R.2d 1412] (1964); Garrison v. State of Louisiana, 379 U.S. 64, 85 S.Ct. 209, 13 L.Ed.2d 125 (1964). While the doctrine of partial immunity, as taught in those cases, may eventually find its way into the field of public health, I can find no supporting authority for application at this time. Quite frankly, the suggestion is not judicially unattractive. There is no reason why the communications media should keep the public less well informed about those engaged in the public health field, than about the merits and demerits of public officials. The mantle of partial immunity might well cover both."

As previously indicated (footnote 1), we have set out in an Appendix hereto the full text of the three television broadcasts, and this should be read in basis for and relationship to the discussion which follows.

At the time of the District Court's decision as its opinion noted, the Supreme Court had made initial First Amendment thrust at state libel law in relation to "public officials", by the *New York Times, Garrison* and *Rosenblatt* cases. Thereafter, prior to the argument of the appeal here, this constitutional thrust had been extended by Associated Press v. Walker and Curtis Publishing Co. v. Butts (joint opinion), 388 U.S. 130, 87 S.Ct. 1975, 18 L.Ed.2d 1094, to defamation related to "public figures", and by Time, Inc. v. Hill, 385 U.S. 374, 87 S.Ct. 534, 17 L.Ed.2d 456, to "suits for invasion of privacy based on false statement where a 'matter of public interest' is involved." [2]

Further, during the period that we have held the appeal under advisement, the Court has declared First Amendment immunity and the standard for defeasance thereof as announced in *New York Times* applicable to protect a public school teacher from dismissal penalty for writing a letter to a newspaper criticizing acts and policies of the Board of Education and the Superintendent of the District on matters in which the public had a legitimate interest. Pickering v. Board of Education, 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811. The Board had determined, after a full hearing, that the letter contained eight false principal statements and that its publication was "detrimental to the efficient operation and administration of the schools of the district."

The Court, however, in making application of the *New York Times* standard against state-law disciplinary consequence, appraised four of the statements as being substantially correct or accurate and the other four, although "factually incorrect in varying degrees", as being "perfectly consistent with good-faith error" and without "evidence in the record to show that anything other than carelessness or insufficient information was responsible for their being made". The significance of the case here is in its extension of the application of the *New York Times* standard, as summarized by Mr. Justice White in his separate opinion: "The core of today's decision is the holding that Pickering's discharge must be tested by the standard of New York Times Co. v. Sullivan * * *" 391 U.S. at 583, 88 S.Ct. at 1742.

Another decision in the First Amendment field, St. Amant v. Thompson, 390 U.S. 727, 88 S.Ct. 1323, 20 L.Ed.2d 262, has also been rendered by the Court while we have been holding the appeal under advisement. That case, however, did not make an extension but merely a reapplication of the scope of *New York Times,* since it involved a libel action brought by a deputy sheriff whom the Court treated as a public official. But the opinion, in setting aside the judgment of recovery, took occasion to remind that the standard of *New York Times* was not to be regarded as having had "its outer limits * * * marked out" so as not to be open to further definition. It characterized *New York Times* and the subsequent cases in which the standard thereof had been applied, either directly or analogously, as having provided "meaningful guidance for the further definition" of the standard.

Of the most relevance here, however, is the fact that the opinion took occasion to reiterate, as the other cases had done (*New York Times, Garrison, Rosenblatt, Walker, Butts, Hill* and *Pickering*), the fundamental basis on which all of the Court's First Amendment thrusts into the various fields thus far presented has rested—the right of the public to have an interest in the matter involved and its right therefore to know or be informed about it.

We think it clear that the area of First Amendment application in protection against state law consequence for injury from speech or publication,

---

**2.** Characterization of the holding in *Hill* as made by the opinion in Pickering v. Board of Education, infra, 391 U.S. 563, 573, 88 S.Ct. 1731, 1737.

where "a matter of public interest" is involved, has had substantial extension since the *New York Times* case and the District Court's decision.

It is, of course, not possible to say just how far the Court will continue to carry such extensions.[3] But unless all other areas, not merely those of legitimate general interest but also those of affecting personal concern to the public, are to be artificially ignored, we are not able to see how the path upon which the Court has been moving can be regarded as having reached an end. And in relation to this, while the Court has been careful to indicate that each move which it has made constitutes only a specific footstep, there has not been in the large volume of discussion in which it has engaged any suggestion of hesitancy or doubt on the part of a majority as to the correctness of the path opened up and the steps taken thereon.

Even among the minority, as *Hill, Butts* and *Walker* seem to us to reflect, the question in the situations dealt with has not been over the extending of First Amendment immunity to any of them. Rather, the difference has been on whether there should be gradations in the standard for defeasance of the immunity (in effect negligence, gross negligence and reckless disregard, respectively) to enable the falsity occurring in a publication to be dealt with on varying responsibility as to the type of situation involved. The minority would seem to desire appraisal of the nature of the public interest at stake and gradations on the basis thereof as to making the

immunity defeasible for the incompleteness, inaccuracy and falsity occurring in the statements and comments made.

That question, however, is not of significance in the present situation. If the publications here are within the field of First Amendment protection at all as against the consequences of state libel law, the area of public interest to which they relate—conditions allegedly capable of wide-spreadedly affecting public health—would seem to us to be one of such inherent public concern and stake that there could be no possible question as to the applicability of the *New York Times* standard for any defeasance.

■ The crucial question here then is whether First Amendment immunity can properly be regarded as extending to disclosure and discussion of professional practices and conditions in the health area involved, so that those engaged in the particular field who may claim to have been stained by such a publication will be subject, in any seeking of redress, to application of the federal standard for defeasance of the Amendment immunity, instead of to the standards of state libel law for recovery.

We have no difficulty in so concluding. The step seems to us no more venturesome than the extension which had been made of *New York Times* to public figures by the cases of Pauling v. New Syndicate Co., 335 F.2d 659 (2 Cir. 1964) and Pauling v. Globe-Democrat Pub. Co., 362 F.2d 188 (8 Cir. 1966), before the decisions in *Butts* and *Walker* had been rendered.

3. Following the *New York Times* decision, Professor Harry Kalven wrote: "It is not easy to predict what the Court will see in the *Times* opinion as the years roll by. It may regard the opinion as covering simply one pocket of cases, those dealing with libel of public officials, and not destructive of the earlier notions that are inconsistent only with the larger reading of the Court's action. But the invitation to follow a dialectic progression from public official to government policy to public policy to matters in the public domain, like art, seems to me to be overwhelming". Kalven, The New York Times Case, 1964 The Supreme Court Review, 191, 221.

After *Hill, Butts* and *Walker*, he further wrote: "The one certain prediction I can make is that judicial review of the common law of defamation, launched by the *New York Times* case, is to be with us for a while to come". Kalven, The Reasonable Man and The First Amendment: Hill, Butts and Walker, 1967 The Supreme Court Review, 267, 269.

Those cases engaged in some analogy of public figures to public officials. In outer respects, such an analogy might have more closeness than one between public officials and persons engaged in the activities here involved. Thus, such persons could perhaps claim not to have offered themselves to the limelight as have public officials and public figures. But though limelight may be a factor in public interest occurring, it can hardly be held to constitute a condition for the right of public interest to exist. Indeed, in the case of Mr. Butts at least, the factor of limelight would seem to have been a relatively subordinate one in the national publication involved.

The primary basis of general interest in the *Butts* situation would have to be regarded as the public's right to be concerned over the nature and significance of the things alleged to have been done, with the persons said to have done them being secondary elements therein. Thus, if some analogy were to be looked for here, in caution against an uncertain extension of First Amendment immunity being made, this aspect would exist sufficiently in the elements of the field in which United Labs was engaged being, from the nature and extent of its capacity to affect health, as naturally entitled to public gaze and interest, and as inherently subject to right of public information and discussion, as were the field and activity in *Butts*—or in *Walker* and *Pauling*.

With the publication in *Butts* being held to be within First Amendment immunity and so not subject to the rules of Georgia libel law, we have no difficulty in persuading ourselves that the situation here, in such attachment as the publications could have to United Labs, is entitled to be held to be within First Amendment immunity and subject to the standard of *New York Times* for any defeasance thereof.

As to the analogy consideration in which we have engaged, it should perhaps be added that, of course, analogy has never been, in common law process, a limitation on the making of legal ap-plication or extension, but only an aid to guidance therein. Thus, the Court did not hesitate to extend First Amendment immunity in *Hill*, without any attempted analogy to the situation of *New York Times*. It merely declared that its conclusion was being guided by "the First Amendment principles in *New York Times*", though not "through blind application of *New York Times*" but "only by applying these principles in (the) discrete context" of the legal and factual situation involved. 385 U.S. at 390–391, 87 S.Ct. at 543.

■ Holding, as we do, that First Amendment immunity and the *New York Times* standard for defeasance thereof are here controlling, we further consideredly conclude that, within the strictness applicable to the question of defeasance, as exemplified in New York Times, 376 U.S. at 285–291, 84 S.Ct. at 729–732, the publications and the showings provide no indication that any probative basis of substance exists in the situation on which "actual malice" might be establishable.

■ In order to recover, United Labs would have to prove with "convincing clarity" that the statements of the publications, if they could be defamatory of it, were made with knowledge that they were false in their alleged implications against it or were made with reckless disregard of whether they were false or not. And in order to be entitled to proceed in this respect, United Labs could be required to show, on proper challenge such as by the motion and showing for summary disposition here, that it had sufficient probative substance to be able litigably to give rise to an issue of fact on whether such malice actually existed or not.

United Labs' affidavits do not challenge the truth of the statements made as to the inaccuracies occurring in the tests involved. Its challenge in this respect is to the alleged implication of the publications that such inaccuracies were characteristic of the testing work of all mail-order laboratories, including itself.

But the initial telecast, after summarizing the various testing inaccuracies which had occurred, concluded with these comments by Cronkite:

"How typical are these results? We don't know, but a sick patient may get only one chance to find out. And, Jay McMullen, we'd like to underscore that the labs in question are all mail-order laboratories, not the community laboratories that do the bulk of the nation's medical testing."

In the third telecast, Cronkite added these comments:

"The CBS News investigation of mail-order medical laboratories has indicated that many firms submitted faulty reports on specimens. But this is not necessarily to be considered an indictment of all laboratories that do business by mail. Many others insist their standards are high, and that mail-order medical testing can be reliable".

The telecasts were wound up by Cronkite as follows:

"Our problem, as Jay McMullen pointed out originally, is that many mail-order laboratories operate virtually without Government supervision; laws vary widely from state to state, and the quality of laboratory analysis can vary just as widely".

Whatever could be the necessity under the liberality of state libel law of allowing these and the other expressions of the telecasts to be carried beyond the point of summary disposition, in view of the right of United Labs, as earlier discussed, to have the question of reference against it, as to such defamation as the telecasts could involve, be given consideration as well on the basis of the general extent of actual application which allegedly had been made against it and the injury which had been occasioned thereby—these aspects are not determinative here.

The primary question on the federal rule and standard is the strict one of actual malice under the safeguard of judicial scrutiny. Unless there are elements present which can judicially be said to be capable of providing a basis with "convincing clarity" for a finding of knowledge or reckless disregard, the Amendment immunity is not legally defeasible.

The publications and the showing here, as stated, contain no indication that any such probative elements exist or are capable of being produced in the situation. Comparably, as in *New York Times*, the failure of CBS to make a retraction as to United Labs would not in the circumstances provide substance for a charge of actual malice under the federal standard, as it might for one of general malice in state libel law, since there was ground for apparent good-faith contention on the part of CBS that the publications were without defamatory reference to United Labs. Indeed, on the strictness of the federal standard as to actual malice, it might perhaps even be arguable that the publications lacked any such convincingly clear reference as to require the question of malice to be considered beyond that point—but we need not deal with and we make no intimation upon this aspect.

In concluding, we add that we have noted the recent New York Supreme Court decision in All Diet Foods Distributors, Inc. v. Time, Inc., 56 Misc.2d 821, 290 N.Y.S.2d 445 (1968). The case dismissed, on the basis of *New York Times*, a complaint for libel recovery under state law, brought by a retail health food and special diet food store against the publisher of a volume on nutrition. A photograph of the plaintiff's store was set out, with the caption appearing in large type on an adjoining page in the volume of "Food Fads and Frauds". The complaint charged that the purpose had been to represent that plaintiff's business was founded on fraud. The court's opinion stated:

"Certainly the subject matter of the article under review is of considerable public interest and it cannot be said of the conduct with respect to motivation that the complaint meets the required

standards. Certainly the intent here was not merely to injure through falsehood; rather the motivation was the protection of the public in the disclosure of a highly important matter affecting the public interest".

The judgment before us is affirmed.[4]

## APPENDIX

### I.

### CBS NEWS FACT FINDING REPORT
—Television broadcast of
June 22, 1965.

CRONKITE: Tonight the first in a series of reports on mail order clinical laboratories. Across this nation an untold number of doctors with untold thousands of patients depend on medical analysis conducted by mail order laboratories. They mail blood, urine and other specimens and receive analysis by mail. For some small town doctors the inducement may be partly convenience. But some mail order laboratories advertise the economic benefits of their cut rate service. These are actual examples: "50% off," "$500 worth of tests for only $90," "Every doctor increase income and cut expenses." But the mail order laboratory business operates virtually without government control. As far as the Federal law is concerned, anyone, no matter what his qualifications, can open up a clinical laboratory and engage in interstate business. Tonight a special report by Producer Jay McMullen and the CBS News Fact Finding Unit after a five-month investigation.

McMULLEN: This is a medical laboratory in New York City. Here, hundreds of human medical specimens are tested each day. Each of these test tubes represents a patient—a man, a woman, a child. The testing of the blood, urine, or other human medical specimens in these tubes is a vital tool in the diagnosis and treatment of illness, and upon the accuracy of these tests may depend the good health and perhaps the life of the patient. Dr. Victor Buhler, President, College of American Pathologists.

DR. BUHLER: Most routine laboratory procedures are done locally. However, there is a thriving business in mail order laboratories. As we understand, thousands of physicians now utilize mail order facilities. While it is true that accurate results can be obtained on some specimens sent through the mail, there are many which deteriorate due to temperature and time and the results are inaccurate. Any laboratory that would accept a specimen on which accurate results cannot be obtained may be endangering the health and even the life of a patient.

McMULLEN: Because numerous health authorities share the doubt that many types of human medical specimens cannot be tested accurately after they have been sent through the mails, we decided to set up an experiment to test mail order laboratories. Under the name of a cooperating physician in New York City, we prepared letters requesting equipment and mailing containers for six routine laboratory tests to be used in the experiment. These letters were mailed to 43 mail order laboratories known to us to be operating outside of New York State in 33 cities in 14 states. Thirteen of the laboratories did not reply. The letters of 13 others said that most of the tests requested could not be handled accurately through the mails * * * and suggested that these tests be done locally in New York City. But 17 (or 39 per cent) of the laboratories sent us equipment for the tests they were willing to undertake. At the New York City Bureau of Laboratories, specimens for the tests were prepared and packaged in containers provided by the mail order

---

4. Incidentally it may be observed that The American Law Institute at its 1967 annual meeting laid aside for a time its attempt to deal with parts of the law of libel for purposes of Restatements, Torts, Second, awaiting further Supreme Court developments. 44th Annual Meeting, The American Law Institute, 1967 Proceedings, p. 188.

laboratories, then immediately air-mailed to those laboratories. Samples of each specimen sent to the mail order laboratories also were sent for testing to control laboratories in New York City—to the laboratories of St. Luke's Hospital, Cancer Memorial Hospital, the Hospital for Joint Diseases and Brooklyn Jewish Hospital. The test results mailed back by the mail order labs were compared with the results obtained by the control laboratories. All the hospital control laboratories found that the bacterial specimen we submitted to them for identification was a Salmonella, Group D—which includes an organism that causes typhoid fever. One hundred per cent of the mail order labs failed to identify this bacterium as a Salmonella of any kind. The Director of the New York City Bureau of Laboratories, Dr. Morris Schaeffer, on the significance of the test.

DR. SCHAEFFER: Salmonella are bacteria which produce diseases, such as typhoid fever, food poisoning, blood poisoning, and dysentery. Infection in an individual can spread to others causing an epidemic. The failure of the mail order laboratories or any other laboratory to identify these organisms may have very serious consequences and this is very shocking, indeed.

McMULLEN: In the Prothrombin Time Test—which measures how quickly blood clots—the control labs found that the blood specimen submitted to them was in a normal range. The mail order labs, that reported on the same specimen, said the clotting time was between 50 to 53 per cent below normal.

DR. SCHAEFFER: A gross error in a Prothrombin Time Test, which measures the clotting time of blood, could cause very serious results. For example, doctors prescribe drugs to keep the clotting time of blood of their patients recovering from coronary heart attacks 15 to 20 per cent below normal. If the lab report shows that the clotting time is slow in the first place, an inadequate amount of drug may be given. That could cause another heart attack or possibly the death of the patient.

McMULLEN: Test three. The control labs agreed that the specimen submitted for the Acid Phosphatase Test was normal. But 25 per cent of the mail order labs said it was abnormal. Dr. Schaeffer.

DR. SCHAEFFER: An abnormal Acid Phosphatase Test could indicate that the patient had a bone tumor or a cancer of the prostate. If the test is inaccurate, unnecessary treatment or surgery could result.

McMULLEN: Test four: blood sugar. The control laboratories reported that the specimen submitted was abnormally high in blood sugar—an indication of diabetes. Four of the mail order laboratories, reporting on the same specimen, said it was normal. Possible diabetes was undetected. The reports of 71 per cent of the mail order labs performing the test varied from the range of the control lab reports by from 20 to 104 per cent. Dr. Schaeffer.

DR. SCHAEFFER: By medical standards, a variance of over 10 per cent in this test is unacceptable. Of course, the significance of not detecting diabetes is clear. But if it is detected the amount of insulin given a patient is determined by the amount of sugar in his blood. If the lab report is inaccurate on the low side he may not get a sufficient amount of insulin to help him. If the lab report is inaccurate on the high side, he may get too much insulin —and an overdose could put him into shock or kill him.

McMULLEN: On the two remaining tests—complete blood count and urinalysis—our medical experts agreed that the reports of the mail order laboratories showed "a disturbing variation" from the reports of the hospital control laboratories. They concluded that some serious medical conditions could therefore have been overlooked. The final results of our experiment: 88 per cent of the 17 mail order laboratories tested were wrong on one or more of the tests

they undertook. Since our experiment did not include mail order laboratories operating in New York City, we decided to send the test for identification of a disease-causing Salmonella to five mail order laboratories operating in the New York area. Again two of our control labs agreed that the bacterial specimen was a Salmonella, Group D—which includes an organism that causes typhoid fever. But a third control—not previously utilized—failed to identify this, as did 100 per cent of the mail order laboratories in the New York area. How typical are these results? We don't know, but a sick patient may get only one chance to find out.

CRONKITE: And, Jay McMullen, we'd like to underscore that the labs in question are all mail order laboratories, not the community laboratories that do the bulk of the nation's medical testing. Tomorrow night the second part of Jay McMullen's report—a close look at one mail order laboratory that failed the same test 12 times.

## II.

CBS NEWS FACT FINDING REPORT
—Television Broadcast
of June 23, 1965.

CRONKITE: Last night, we presented the first in a series of reports on mail order medical laboratories. Our report indicated widespread error among the mail order labs checked by the CBS News Fact Finding Unit. Eighty-eight per cent of those labs were wrong on one or more of the tests they undertook, tests that could involve life or death. That first report involved many laboratories testing actual medical specimens. But tonight's report involves only one lab. And the specimens it received were highly unusual. The reasons are explained by Jay McMullen.

McMULLEN: During our investigation of mail order laboratories, one of our cooperating physicians obtained some literature from an organization called Nutritional Research Associates.

This literature offered to do a laboratory test called a Urine Hormone Assay for a price that surprised Dr. Alfred Kogon of Baltimore, Md.

DR. KOGON: The literature itself stated that most laboratories would charge between $95 and $125 for these tests. Yet, Nutritional Research Associates offered to perform them routinely for only $15 and, as a special introductory offer for the physician and his family, at only $5 each. I was curious to know how Nutritional Research Associates could perform these tests at so low a price.

McMULLEN: We found that Nutritional Research Associates, Inc., is located in this house in Cedar Rapids, Iowa. It is incorporated as a non-profit corporation "to provide laboratory facilities for its members to do research on nutritional deficiency and efficiency." Nutritional Research Associates sent the following instructions to Dr. Kogon.

DR. KOGON: Instructions of Nutritional Research Associates were that the check in payment for the hormone assay on urine was to be sent to them at Cedar Rapids, Iowa, but the urine specimen itself was to be placed in a small plastic bottle, then into a mailing carton they themselves supplied and sent directly to Science Laboratories in Flagstaff, Ariz.

McMULLEN: In Flagstaff, Ariz., we had some difficulty in locating Science Laboratories. Its address is a post office box assigned to a Mr. Robert Bernard Holmes. The Flagstaff telephone directory does not list a Robert B. Holmes or Science Laboratories. But, we found that this house is owned by a Robert Bernard Holmes. Mr. Holmes —shown here—has said he has a degree as a medical technologist. He also has an office in Flagstaff in this building at 13 North San Francisco Street. On the door we found the words: "Science Laboratories—Research only."

DR. KOGON: All that Science Laboratories required was a morning urine collection—enough to fill this small

bottle. This also surprised me because the standard procedure in hormone assay tests requires a complete 24-hour urine collection which is necessary to measure the daily hormone output. Therefore, the procedure of Science Laboratories seemed highly unorthodox, to put it mildly.

McMULLEN: Because there were doubts, we decided to test Science Laboratories. At our request, cooperating physicians in California, Massachusetts, Virginia and New York wrote to Nutritional Research Associates and also received in reply N.R.A.'s literature and hormone kits. In New York, the Bureau of Laboratories, New York City Health Department, prepared, at our request, a solution containing distilled water, colored yellow, to simulate human urine. Could Science Laboratories find any hormones in this? Dr. Morris Schaeffer, Director, New York City Bureau of Laboratories.

DR. SCHAEFFER: A proper assay of the solution we prepared could not possibly find any hormones or anything related to them.

McMULLEN: The 12 specimen bottles received by our cooperating physicians were filled with the colored water solution prepared by the Bureau of Laboratories. The bottles were repackaged in the cartons provided and mailed by our cooperating physicians to Science Laboratories, Flagstaff, Ariz. Each doctor received back a test report from Nutritional Research Associates. These reports were examined by Dr. Schaeffer, Director, New York City Bureau of Laboratories.

DR. SCHAEFFER: These reports are amazing. They all show sizeable amounts of hormones in seven different categories. You would expect to find such hormones in an assay of a genuine sample of urine—but not in an assay of colored water. Beyond that, the specimens sent by the different physicians were all part of the same colored water solution. Yet no two of these reports are alike—except that they all report low metabolic function in the patients and recommended nutritional supplements.

McMULLEN: After receiving his report, Dr. Alfred Kogon of Baltimore got a letter.

DR. KOGON: Several days later I received a letter from a man in Virginia who said he was the regional representative of an organization called Professional Foods. He said he had received a copy of the hormone assay from Nutritional Research Associates which had suggested a need of nutritional supplements. He enclosed an order blank and a price list for a number of nutritional supplements sold by his organization, Professional Foods.

McMULLEN: We found that Professional Foods wholesales health foods and vitamins and has sales representatives in various cities throughout the United States. Its main office is in Cedar Rapids, Iowa—in this same building occupied by Nutritional Research Associates. The President of Nutritional Research Associates, Samuel C. Fulkerson, is also listed as the owner of Professional Foods. District salesmen for Professional Foods, after being notified by Nutritional Research Associates, now have contacted each of our cooperating physicians who sent a solution containing colored water to Science Laboratories. These are some of the nutritional supplements offered for sale by Professional Foods. They were offered as a treatment for the nutritional deficiencies found by Science Laboratories in our solution containing distilled water, colored yellow.

CRONKITE: A representative of Science Laboratories has said that his laboratory services 8,000 doctors. We do not know to what extent the doctors, Nutritional Research Associates, Professional Foods or their representatives are aware of what occurs in Science Laboratories in Flagstaff, Ariz. Today, the fact finding unit sent a specimen of the colored water solution and data on its

investigation to interested authorities in Washington, D.C. And how do the mail order labs themselves react to the findings of the CBS Fact Finding Unit? A laboratory spokesman replies on this program tomorrow night.

### III.
### CBS NEWS FACT FINDING REPORT
—Television broadcast of
June 24, 1965.

CBS NEWS RADIO BROADCAST of June 24, 1965.

(As shown by the News Release of June 25, 1965, appearing in the record.)

Following is the text of the report on mail order laboratories, stemming from the CBS News Fact Finding Unit's investigation of the accuracy of the testing of medical specimens by mail order laboratories, as broadcast last night (Thursday) on CBS EVENING NEWS WITH WALTER CRONKITE (6:30–7:00 PM, EDT, in some areas; 7:00–7:30 PM, EDT, in other areas) on the CBS Television Network and on "The World Tonight" (8:00–8:15 PM, EDT) on the CBS Radio Network. The newsmen, in addition to Mr. Cronkite, were CBS News Correspondents Paul Niven, Wells Church and Dave Dugan, and reporter Bob Nelson, of Station WMT-TV, CBS Television Network affiliate in Cedar Rapids, Iowa.

CRONKITE: Last night, on this program, we presented a medical mystery story, the story of 12 samples of distilled water, colored yellow, submitted to a mail order medical laboratory. It was asked to perform a hormone test which is normally conducted on specimens of human urine. The results were surprising. The New York City Bureau of Laboratories, which prepared the colored water specimens, said it would be impossible to find any hormones in that water. Yet the mail order lab returned reports showing sizeable amounts of hormones in the samples submitted. That mystery story was part of a series on mail order laboratories, prepared by Jay

McMullen and the CBS News Fact Finding Unit. And today, the case of the colored water attracted attention in Washington. Comment now from the Chief Postal Inspector, Henry Montague, and the Commissioner of the Food and Drug Administration, George Larrick.

MONTAGUE: We saw Mr. Cronkite's programs the last two evenings. In fact, we had one of our inspectors, who specializes in medical fraud investigation, in New York yesterday to talk to the CBS people, and he is back there again today. This morning we received from the program, from CBS News, a letter which also contained a sample of the package which had been sent through the mails. We intend to make an investigation.

NIVEN: Do you share jurisdiction in this type of case with the Food and Drug Administration?

MONTAGUE: Today I contacted the office of the Commissioner of Food and Drug to determine whether they feel that they might have concurrent jurisdiction. At the moment that is not certain, but in any event, we have made arrangements to coordinate our investigation with their office so that if there is joint jurisdiction we will handle it jointly.

LARRICK: We think it is a very serious situation if a sick person is being diagnosed and the work upon which his treatment will be predicated is not well done and is not accurate. As a matter of fact, we've worked with your associate Mr. McMullen in some of these fields.

CHURCH: In other words, this is not a new operation to you?

LARRICK: No, it is not a new operation.

CHURCH: Has your staff already worked on this, in addition to the work with Jay?

LARRICK: Yes, we have tried to keep in touch with this field. Our clear authority to deal with it is when the

diagnosis is accompanied, in one way or another, by the shipment of medicine or a theraputic device or something in interstate commerce that gives us clear jurisdiction. And we have investigated some of the firms to which Mr. Jay McMullen refers and are continuing our investigation. I have not been briefed on our most recent investigation in this field which is going on now and which is being stimulated by Mr. McMullen's investigation. And we will, when we conclude the study of that investigation, then reach a conclusion about whether we should recommend additional legislation.

CRONKITE: As you may recall, the case of the colored water involved three firms. The first was a firm in Cedar Rapids, Iowa—Nutritional Research Associates—which advertised the hormone test for urine. Doctors who responded were advised to send the samples directly to Science Laboratories in Flagstaff, Ariz. Shortly after receiving the hormone reports, the doctors were contacted by another firm—Professional Foods— which offered to sell nutritional supplements as a treatment for deficiencies indicated by the hormone test. Professional Foods had the same Cedar Rapids address as Nutritional Research Associates. In the interest of fairness, CBS News tried to obtain reaction from the firms involved. In Flagstaff, Ariz., the operator of Science Laboratories, Robert Bernard Holmes, was interviewed last night. But today, he asked that the interview not be used. In Cedar Rapids, we contacted Samuel Fulkerson, the president of Nutritional Research Associates, who is also listed as owner of Professional Foods. Last night, he turned down a request for an interview by CBS News. But today, he consented to an interview with Bob Nelson of Station WMT-TV, a CBS affiliate.

BOB NELSON: What's your first impression of the CBS News report of last night?

FULKERSON: This is something I don't even want to talk about for the simple reason it is a—not a statement that has proper background in any area. It is subterfuge, insinuation and so forth.

BOB NELSON: Is your firm, Professional Foods—have they done anything wrong?

FULKERSON: Not one bit and of course, in the original statement, they didn't say anything about us doing wrong. They just put us in with the guy that they think they have found in the wrong.

BOB NELSON: Can you understand how it would be possible for the Science Laboratories in Flagstaff, Ariz., to mistake this colored water or something, or what's your opinion on what happened here?

FULKERSON: I don't know—I refuse to make a statement because I don't know. I've known the man for 15 years and I've never known him to do anything—and I've been checking all the time myself. But what do you know? I've known people to make a mistake.

CRONKITE: Fulkerson insisted his firm had done nothing wrong and he said his company has no direct connection with Science Laboratories. The CBS News investigation of mail order medical laboratories has indicated that many firms submitted faulty reports on specimens. But this is not necessarily to be considered an indictment of all laboratories that do business by mail. Many others insist their standards are high, and that mail order medical testing can be reliable. One man who advances that argument is Dr. Louis Winkelman, Medical Consultant of Kings County Research Laboratory in Brooklyn. He talked with Dave Dugan.

DUGAN: Dr. Winkelman, is it possible for certain tests that are sent through the mails to decompose, for the samples not to come through exactly the way they should be?

DR. WINKELMAN: That is possible. However, precautions can easily be taken and proper instructions can be given to the doctors who are going to submit their specimens through the mail so as to preserve the stability and the sterility of the specimens to be examined, especially in the six tests that were described by your office.

DUGAN: Why is it necessary to have a laboratory such as yours that the specimens are sent in by mail? Aren't there enough local laboratories around the country?

DR. WINKELMAN: The value of performing laboratory tests through the mail is going to increase in the future. There are many tests that are being done now that are simply beyond the realm of a small, local laboratory. And in order to give service to many doctors throughout the country in small communities where the local laboratory may not be able to perform unusual tests, for him to have a method to send his test through the mail to recognized laboratories so that these tests can be done for his patients.

DUGAN: Do you feel that laboratories that do their business through the mail have gotten a bad reputation?

DR. WINKELMAN: Very strongly so. The condemnation has been in the last two days on Mr. Cronkite's program that the inaccuracy of these results has been due to the fact that the specimens were submitted by the mail. I maintain that tests of specimens submitted by the mail are and can be performed accurately. If accurate (sic) results were found in these laboratories listed in the last two days, it was not due to the fact that it was submitted by the mail. The error is due to the laboratory itself.

CRONKITE: Our problem, as Jay McMullen pointed out originally, is that many mail order laboratories operate virtually without Government supervision; laws vary widely from state to state, and the quality of laboratory analysis can vary just as widely.