**Reverend Kirby J. HENSLEY et al.,**
**Plaintiffs,**

**v.**

**LIFE MAGAZINE, TIME, INC., et al.,**
**Defendants.**

**No. 69 553.**

United States District Court,
N. D. California.

July 26, 1971.

Peter R. Stromer, San Jose, Cal., for plaintiffs.

Pillsbury, Madison & Sutro, John B. Bates and John A. Sutro, Jr., San Francisco, Cal., for defendants.

## MEMORANDUM OF DECISION

SWEIGERT, District Judge.

This is an action for alleged libel brought by plaintiffs, Kirby Hensley and Universal Life Church, Inc., against defendants Time, Inc., its president and its managing editor and one of its reporters, Bill Bruns.

The case is now before the court on motions for summary judgment by both plaintiffs and defendants.

The action arises out of an article entitled "Praise the Lord and Pass the Diplomas" which appeared in the November 14, 1969 issue of Life Magazine, a publication of Time, Inc.

The only portion of the article referring to plaintiff Hensley reads as follows:

"I saw the light, so to speak, when I read a newspaper interview with Kirby Hensley, an illiterate California minister who claimed he had ordained 225,000 'ministers' through the mail. Hensley talked about the ease of ordination (a postage stamp is all he requires) and the advantages that can come to a man of the cloth who wants it to be silk; a tax-free existence, discounts in travel, entertainment and merchandise, even a draft deferment. . . . To find out if it could all be so easy and so legal, I decided to pose as a prospective minister. Within weeks—offering no personal information other than my name and address—I had my ordination and church charter from Hensley . . . ."

No mention of Universal Life Church is made in the article except that, according to plaintiffs' complaint, one of the church's identical certificates is identifiable in a photograph accompanying the article.

Notably, the complaint does not allege that any of the above quoted statements about Hensley are false, nor does the complaint challenge the truth of any statements made in the article or in its caption title.

The only allegation of falsity is directed, not at the article, itself, nor at the caption title, but at another descriptive title separately set forth in the Table of Contents of the magazine: "The Instant Minister Racket—How a Reporter Became a Man of the Cloth for $10, by Bill Bruns."

The allegation of the complaint is that "by titling the article as 'The Instant Minister Racket' plaintiff has been libelled per se since said title is false and untrue, libelous and defamatory . . . . The term 'racket' clearly imputes criminal and/or illegal behavior to plaintiff . . . . ." [1]

Defendants' motion for summary judgment is made upon the ground that plaintiff cannot prove "actual malice" of defendants, i. e., that the claimed libelous material was published by defendants "with knowledge that it was false or with reckless disregard of whether it was false or not."

This actual malice rule upon which defendants rely, which was first enunciated in New York Times Co. v. Sullivan, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964) involving a libel action against a public official, has been extended to publications concerning so-called public figures. Curtis Publishing Company v. Butts and Associated Press v. Walker, 388 U.S. 130, 134, 87 S.Ct. 1975, 18 L.Ed.2d 1094 (1967); [2] Beckley

---

1. The word "racket" does not necessarily connote a fraudulent or illegitimate enterprise; it may simply mean an easy and lucrative means of livelihood or even, when used in a popular, slang sense, merely one's occupation or business. (Webster's Collegiate Dictionary).

2. It should be noted that in *Curtis* the test for liability in actions by public figures was differently stated by Harlan, J. (142–145, 87 S.Ct. 1975) (joined by JJ. Clark, Stewart and Fortas) on the one hand, and Chief Justice Warren (pp. 162–165, 87 S.Ct. p. 1995) (joined by JJ. Black, Douglas, Brennan and White) on the other. Harlan, et al., stated the test for such cases to be not the above-quoted test of New York Times v. Sullivan, but whether defendant was guilty of "highly

Newspapers Corp. v. Hanks, 389 U.S. 81, 88 S.Ct. 197, 19 L.Ed.2d 248 (1967); Greenbelt Co-op Pub. Assn. v. Bresler, 398 U.S. 6, 90 S.Ct. 1537, 26 L.Ed.2d 6 (1970); Ocala Star-Banner Co. v. Damron, 401 U.S. 295, 91 S.Ct. 628, 28 L.Ed. 2d 57 (1971); Monitor Patriot Co. v. Roy, 401 U.S. 265, 91 S.Ct. 621, 28 L. Ed.2d 35 (1971); Time, Inc. v. Pape, 401 U.S. 279, 91 S.Ct. 633, 28 L.Ed.2d 45 (1971).

More recently, the Supreme Court in Rosenbloom v. Metromedia, 403 U.S. 29, 91 S.Ct. 1811, 29 L.Ed.2d 296 (1971), has further extended the test of New York Times v. Sullivan, to suits by private individuals for alleged defamatory falsehood about the individual's involvement in an event of public or general interest (pp. 43–44, 91 S.Ct. 1819–1820). See also our Ninth Circuit case United Medical Lab., Inc. v. Columbia Broadcasting System, 404 F.2d 706, 711 (1968).

In Rosenbloom (403 U.S. p. 56, 91 S. Ct. p. 1826) [3] the Court also confirmed the holding of St. Amant v. Thompson, 390 U.S. 727 at 731, 88 S.Ct. 1323 at 1325, 20 L.Ed.2d 262 (1969) that the *New York Times* standard is not met by merely showing what "a reasonably prudent man would have published, or would have investigated before publishing. There must be sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication."

In light of these cases the questions raised by defendants' motion for summary judgment are:

(1) Whether the record here shows that there is a genuine issue of fact as to whether plaintiffs were either public figures or private individuals about whom the alleged defamatory publication concerned a matter of public or general interest;

(2) whether there is a genuine issue of fact as to whether the publication concerning them was made by defendants with knowledge that it was false or with reckless disregard of whether it was false or not.

Rule 56(e) Fed.R.Civ.P. provides that when a motion for summary judgment is made and supported as provided in the rule, an adverse party may not rest upon the mere allegations of his pleading but his response, by affidavits or as otherwise provided in the rule, must set forth specific facts showing that there is a genuine issue of material fact for trial.

Accordingly, it has been held that when a motion for summary judgment is made by a defendant in a libel action, based upon the ground, supported by affidavits, of lack of actual malice in the publication of material concerning a matter of public or general interest, the burden rests upon the plaintiff to make an affirmative evidentiary showing that there is a genuine issue of fact as to the material matters involved.

unreasonable conduct constituting an extreme departure from the standards of investigation and reporting ordinarily adhered to by responsible publishers." The Chief Justice, et al., adhered to the New York Times v. Sullivan test of actual malice, i. e., proof that defendant made the defamatory statement "with knowledge that it was false or with reckless disregard of whether it was false or not"—the test that has been followed by the Supreme Court in subsequent cases. See, Rosenbloom v. Metromedia, Inc., 403 U.S. 29, 91 S.Ct. 1811, 29 L.Ed.2d 296 (1971).

3. In Rosenbloom v. Metromedia, supra, plaintiff, a private publisher, after having

been acquitted of criminal charges of possession of obscene books, sued for libel a radio station which had publicized his arrest and had characterized his business as the "smut literature racket." A judgment for the plaintiff, based upon a jury verdict, was reversed by the Court of Appeals on the basis of the *New York Times* standard; the Supreme Court, after noting (p. 40, 91 S.Ct. p. 1818) that the Court of Appeals had held that "as a matter of law, petitioner's evidence does not meet that standard," affirmed.

In United Medical Lab., Inc. v. Columbia Broadcasting System, supra, 404 F. 2d at p. 712, the Court, affirming summary judgment under these circumstances, held that plaintiff "could be required to show, on proper challenge such as by the motion and showing for summary disposition here, that it had sufficient probative substance to be able litigably to give rise to an issue of fact on whether such malice actually existed or not . . . unless there are elements present which can judicially be said to be capable of providing a basis with 'convincing clarity' for a finding of knowledge or reckless disregard, the Amendment immunity is not legally defeasible." See also, Cerrito v. Time, Inc., 302 F.Supp. 1071 (N.D.Cal.1969); Washington Post Company v. Keogh, 125 U.S.App.D.C. 32, 365 F.2d 965 (1966).

■ On the question whether the publication in this case concerned a public figure or a private individual about whom the published material was a matter of public or general interest, defendants support their motion for summary judgment by affidavits, mainly the extensive and detailed affidavit of Bruns, to the effect that before publication of the November 1969 article, plaintiff Hensley and his Universal Life Church had already become public figures about whom the published material concerned matters of public or general interest; specifically, that they had already received continuous and widespread news publicity since early 1969 concerning asserted cheap and easy issuance of ministerial ordination credentials; that said publicity stressed claims assertedly made by Hensley concerning the advantage of such credentials as means for obtaining travel and merchandise discounts and for avoiding taxes and military service; that dispatches were also to the effect that Hensley of the Universal Life Church had been fined in San Jose, California Municipal Court for violating the city's Education Code by issuance of $25 ministry certificates; that dispatches were also to the effect that Hensley had in 1964 and 1968 announced himself as a presidential candidate.

Since plaintiff's evidentiary record contains nothing to the contrary of these affidavits, there appears to be no genuine dispute about facts which, if true, would in our opinion clearly establish that plaintiffs had become public figures in the sense that the material published about them concerned the public or general interest.

On the question whether defendants published the material with knowledge of falsity or with reckless disregard of whether it was false or not, defendants support their motion for summary judgment with affidavits to the effect that Bruns was a dependable and reputable researcher and writer; that he had made a long and thorough investigation of the ministerial diploma-granting activities of Hensley and the Universal Life Church and similar activities generally; that he conducted numerous interviews all over the country and had read extensive material on the subject; that during preparation of the article he even presented himself to Hensley as an applicant for a ministerial credential and had actually received one; that he relied, not only on the extensive previous publicity, but also on handouts by Hensley, himself, which tended to confirm the statements made about him; that in October, 1969, just before publication, he directly interviewed Hensley by telephone, advising him that a story on him was being prepared for Life, and that Hensley substantially verified the subject matter of the article, including a statement by Hensley to the effect that he had been ordered by a California Court to stop issuing any more doctorates in California and that henceforth he would issue them from Arizona; that, based upon this detailed investigation and verification, Bruns, together with the two senior editors and an associate editor of Life, believed the truth of the article beyond any doubt.

Although plaintiffs have presented two affidavits herein,[4] they make no attempt to deny or counter this evidentiary material concerning this investigation and verification leading to defendants' belief beyond doubt of the truth of the publication.

 Plaintiffs' argument on motion for summary judgment narrows to the contention that defendants, having readily admitted in their answer to interrogatories that the Table of Contents pages of individual issues of Life Magazine are not reviewed, as such, by attorneys to determine their potential for libel action and that no attorneys were consulted about the Table of Contents' use of the term "Instant Minister Racket" in this particular issue (defendants) must be held guilty of "highly unreasonable conduct constituting an extreme departure from the standards of investigation and reporting ordinarily adhered to by responsible publishers" within the meaning of Curtis-Publishing Co. v. Butts, supra, pp. 152–154, strongly relied on by plaintiffs here.

It is obvious that plaintiffs have misconceived both the effect of *Curtis* (see our note re that case, supra) and the proper test now clearly established by the Supreme Court in *Rosenbloom*, i. e., not the *Harlan* test of mere negligence, but the *New York Times* test of actual malice as expounded and applied by *Rosenbloom*, supra, and United Medical Lab., Inc. v. Columbia Broadcasting System, supra, i. e., "sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication."

Judged according to this latter and proper test, the summary judgment record in this case is devoid of evidentiary material tending to show that

there is a genuine issue of fact on either of the two material issues presented.

For the foregoing reasons it is ordered that defendants' motion for summary judgment be and is hereby granted and that plaintiffs' motion for summary judgment be and is hereby denied.

---

4. Plaintiff's affidavits are merely to the effect that Hensley is illiterate; that his Universal Church teaches a beneficent doctrine, e. g., that "Heaven is a state of mind when you have what you want and hell is a state of mind when you don't have what you want;" that he tells all his ministers to do whatever is right and that his activities have been carried on without objection in all states "save California because the California Attorney General contends that an Honorary Doctor of Divinity title might mislead the public as if it were an earned degree."