Vito LaBRUZZO, Plaintiff,

v.

The **ASSOCIATED PRESS** et al.,
Defendants.

Civ. A. No. 18034–2.

United States District Court,
W. D. Missouri, W. D.

Jan. 26, 1973.

Lonnie J. Shalton, Popham, Popham, Conway, Sweeny & Fremont, Kansas City, Mo., for plaintiff.

J. D. James, James & McCanse, Kansas City, Mo., Royall, Koegel & Wells, New York City, for AP.

Donald W. Giffin, Frank B. W. McCollum, Spencer, Fane, Britt & Browne, Kansas City, Mo., for Metromedia.

William L. Turner, Myron S. Silverman, Gage, Tucker, Hodges, Kreamer, Kelly & Varner, Kansas City, Mo., for Meredith.

## MEMORANDUM AND ORDER GRANTING DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

COLLINSON, District Judge.

This is an action seeking to recover both actual and punitive damages for libel. There are three remaining defendants—Associated Press ("AP"), Metromedia, Inc. ("KMBC–TV, Channel 9") and Meredith Corporation ("KCMO–TV, Channel 5"). Presently pending before the Court are the defendants' separate motions for summary judgment.

On March 1, 1969, plaintiff, along with 13 other men, left Kansas City by air for Miami, Florida for the purpose of playing golf. Plaintiff states that a group of men, composed of substantially the same members, had made an annual golfing trip beginning about 1965. Upon the group's arrival in Miami, each member was served with a subpoena to appear before a federal grand jury on March 5, 1969.

On the day the subpoenas were served, Verne Williams, a reporter, called in a story about the subpoenaing to Gene D. Plowden, an AP newsman. Plowden drafted a story reporting the event, and sought to confirm the accuracy of the story by talking to Tom Anderson, a

federal agent, and Lieutenant Golden of the Miami Police Department.

Plowden's draft and notes were given to J. Dennis Friel, an AP newsman. In order to confirm the story, Friel spoke twice to James Savage, a veteran reporter for the *Miami News*; William Earle and Peter Koste, attorneys with the United States Department of Justice Organized Crime Strike Force in Miami, who had spearheaded the subpoena party; and Adam Carter, a detective in the organized crime section of the Dade County (Florida) Public Safety Department. Friel also contacted the Miami police, the Federal Bureau of Investigation and other law enforcement agencies which were involved in the serving of the subpoenas. Although he attempted to, Friel was unable to reach the 14 members of the golfing group.

Thereafter, Friel wrote a story incorporating the facts and comments which he had received and a part of Plowden's original draft. This story was transmitted over the AP wires at 5:12 p.m. Essentially, the article stated that 15 men were served with federal grand jury subpoenas when they arrived in Miami "enroute to what police described as a convention to nominate candidates to succeed the late Mafia head Vito Genovese." Plaintiff's name was mentioned as one of those who had been served with a subpoena.

Three additions to the first story were made and transmitted that evening at 7:00 p.m., 9:30 p.m. and 11:10 p.m. The additions identified the men as the "Kansas City contingent" or the "Kansas City group," and described the businesses of several of the individuals, including the plaintiff.

On March 2, another story was transmitted over the AP wires at 7:12 p.m. This article was again written by Friel, who had contacted Earle and Koste, the *Fort Lauderdale News*, the *Miami Herald*, Carter and the Miami police prior to completing the story. The article summarized the positions taken by Earle and Koste, Carter and the Kansas City group, and included quotes from the law enforcement officials. Plaintiff was identified as one who had been served with a subpoena. A substitution was transmitted at 9:51 p.m. which corrected the spellings of the names of the Kansas City men.

Friel wrote a third story on the incident on March 3, describing the actions of the Kansas City men after the subpoenaing at the airport, stating in part that they had split up and had gone to various hotels and homes. The article further stated that "spokesmen for the U. S. Justice Department said the Kansas City contingent was here for its annual winter business meeting, but local detectives said a convention was also planned to nominate possible successors to Mafia boss Vito Genovese." Plaintiff was not identified in the article. Friel had compiled his article from conversations with the authorities, including Earle, the Miami police and Savage.

Theodore A. Edinger, an AP reporter, called in a story to the AP Miami Bureau on March 5, concerning the grand jury proceedings. The story was taken down by Plowden. Plaintiff was quoted extensively in the article. A later story, also written by Edinger, was an update and contained essentially the same information. Plaintiff has stipulated that his statements to the reporters were voluntary.

The depositions and affidavits submitted by defendant AP support the reliability of Savage as a reporter, and Earle, Koste and Carter as news sources. Plaintiff has stipulated that Earle and Carter spoke to a number of reporters about the subpoenaing and facts surrounding it.

The Justice Department attorneys described four members of the Kansas City group as known Mafia members. The other members in the group were described as "non-member associates." Plaintiff has stipulated that he had been a friend of the four who have been described as linked to the Mafia; that he knew the group was under surveillance

by federal and local law enforcement agents; and that he has known since 1966 or 1967 that his association with these men made him a subject of attention by law enforcement officers.

On March 1, defendants Metromedia and Meredith received wire releases from AP and UPI (United Press International) describing the Kansas Citians' arrival in Miami and the subsequent serving of subpoenas upon them. Channel 5 (KCMO–TV) broadcast stories on the event on the 10:00 p.m. news program on March 1, and on the 6:00 p.m. and 10:00 p.m. broadcasts on March 2. Channel 9 (KMBC–TV) broadcast stories during their 10:00 p.m. news program on March 1, and on the 6:00 p.m. and 10:00 p.m. news on March 5. All of Channel 5's broadcasts were totally based on the AP wire releases. Channel 9's broadcast of March 1 was based on the AP and UPI wire releases; the March 5 broadcasts were based on AP and UPI wire releases and an ABC–TV video-tape which contained an interview with the plaintiff. The defendants' affidavits establish their reliance on the wire releases, and plaintiff has stipulated that he has no evidence to contest this.

It is further stipulated by plaintiff and supported by defendants' affidavits that none of the employees or agents of any of the defendants harbored any rancor, anger, hatred or ill will toward the plaintiff nor did any know or meet plaintiff prior to the day of his appearance before the grand jury.

Defendants have moved for summary judgment on plaintiff's claim of defamation, contending that the affidavits in support of the motions, depositions and other discovery materials show conclusively that plaintiff cannot meet the burden imposed upon him by the First and Fourteenth Amendments to prove actual malice.

 Federal courts are reluctant to deprive a litigant of the opportunity to present his case to a jury. This is particularly so since under Rule 56, F.R. Civ.P., the courts are denied the right to enter summary judgment if there is a disputed issue of fact which, if found in favor of the losing party, would entitle him to have a verdict by the jury sustained. However, where it is clear that the record has been fully developed by depositions and affidavits on a motion for summary judgment, and such record demonstrates that, construing all of the facts and inferences to be drawn therefrom in favor of the party against whom the judgment is entered, he would not be entitled to have a jury verdict stand, the granting of summary judgment is proper. Time, Inc. v. McLaney (C.A. 5) 406 F.2d 565, 571–572 (1969), cert. den. 395 U.S. 922, 89 S.Ct. 1776, 23 L.Ed.2d 239. "The decision on a motion for summary judgment requires an uneasy choice between the opponent's right to a jury's determination of his case and the interest of the proponent in the avoidance of trials that serve no useful purpose." Davis v. National Broadcasting Co. (E.D.La.) 320 F.Supp. 1070, 1073 (1970) aff'd per curiam (C.A. 5) 447 F.2d 981 (1971). Summary judgment has been held to be the proper vehicle for pretrial determination of defamation claims where the constitutional defense of lack of actual malice is raised. Bon Air Hotel, Inc. v. Time, Inc. (C.A. 5) 426 F.2d 858, 864–865 (1970); Wasserman v. Time, Inc., 138 U.S.App.D.C. 7, 424 F.2d 920, 922 (1970), cert. den. 398 U.S. 940, 90 S.Ct. 1844, 26 L.Ed.2d 273; Treutler v. Meredith Corp. (C.A. 8) 455 F.2d 255 (1972); Time, Inc. v. McLaney, *supra*; United Medical Laboratories v. Columbia Broadcasting System, Inc. (C.A. 9) 404 F.2d 706 (1968), cert. den. 394 U.S. 921, 89 S.Ct. 1197, 22 L.Ed.2d 454 (1969); Time, Inc. v. Johnston (C.A. 4) 448 F.2d 378, 383 (1971); Gospel Spreading Church v. Johnson Publishing Co., 147 U.S.App.D.C. 207, 454 F.2d 1050 (1971); Novel v. Garrison (N.D.Ill.E.D.) 338 F.Supp. 977 (1971); Hensley v. Life Magazine, Time, Inc. (N.D.Cal.) 336 F.Supp. 50 (1971).

There are two questions which the Court must determine in light of defend-

ants' motions for summary judgment on constitutional grounds: (1) Whether the constitutional guarantees of the First Amendment deny recovery to the plaintiff unless he can show that the defendant published the statements about him with actual malice; and (2) if so, whether the record demonstrates that there is no issue of fact from which a jury could find actual malice.

In New York Times Co. v. Sullivan, 376 U.S. 254, at 279–280, 84 S.Ct. 710 at 726, 11 L.Ed.2d 686 (1964), the Court limited a state's power to award damages in a libel action brought by a public official against critics of his official conduct, stating:

> The constitutional guarantees require, we think, a federal rule that prohibits a public official from recovering damages for a defamatory falsehood relating to his official conduct unless he proves that the statement was made with "actual malice"—that is, with knowledge that it was false or with reckless disregard of whether it was false or not.

The Court later held that the actual malice standard of the New York Times case does not apply only to the "official conduct" of a public official, nor is it rendered inapplicable merely because an official's private reputation, as well has his public one, is harmed. Ocala Star-Banner Co. v. Damron, 401 U.S. 295, 91 S.Ct. 628, 28 L.Ed.2d 57 (1971); Garrison v. Louisiana, 379 U.S. 64, 85 S.Ct. 209, 13 L.Ed.2d 125 (1964). See also Monitor Patriot Co. v. Roy, 401 U.S. 265, 91 S.Ct. 621, 28 L.Ed.2d 35 (1971); Rosenblatt v. Baer, 383 U.S. 75, 86 S.Ct. 669, 15 L.Ed.2d 597 (1966).

In Curtis Publishing Co. v. Butts, 388 U.S. 130, 87 S.Ct. 1975, 18 L.Ed.2d 1094 (1967), the Court extended the First Amendment guarantees to misstatement of fact in discussing public figures in the report of an event of "public or general interest." See Pauling v. Globe-Democrat Publishing Co. (C.A. 8) 362 F.2d 188 (1966); Vanderburg v. Newsweek, Inc. (C.A. 5) 441 F.2d 378 (1971);

Time, Inc. v. Johnston, supra. "We conclude that the constitutional privilege extends to discussions by specific individuals, not associated with any government, if those individuals are involved in matters of important public concern." Time, Inc. v. McLaney, supra, 406 F.2d at 573.

The Court broadened the scope of the New York Times standard in Rosenbloom v. Metromedia, Inc., 403 U.S. 29, 91 S.Ct. 1811, 29 L.Ed.2d 296 (1971), when faced with the question of whether the actual malice standard applies in a state civil libel action brought not by a "public official" or a "public figure" but by a private individual for a defamatory falsehood uttered in a news broadcast by a radio station about the individual's involvement in an event of public or general interest. In answering in the affirmative, the Court stated at 43, 91 S.Ct. at 1819:

> If a matter is a subject of public or general interest, it cannot suddenly become less so merely because a private individual is involved, or because in some sense the individual did not "voluntarily" choose to become involved. The public's primary interest is in the event; the public focus is on the conduct of the participant and the content, effect, and significance of the conduct, not the participant's prior anonymity or notoriety.

And at 52, 91 S.Ct. at 1824:

> We thus hold that a libel action, as here, by a private individual against a licensed radio station for a defamatory falsehood in a newscast relating to his involvement in an event of public or general concern may be sustained only upon clear and convincing proof that the defamatory falsehood was published with knowledge that it was false or with reckless disregard of whether it was false or not. Calculated falsehood, of course, falls outside "the fruitful exercise of the right of free speech." Garrison v. Louisiana, 379 U.S. 64, 75, [85 S.Ct. 209, 216, 13 L.Ed.2d 125] (1964).

In Bon Air Hotel, Inc. v. Time, Inc., *supra,* 426 F.2d at 861, the Court held that "publication concerning matters of public interest are protected by the first amendment absent proof of actual malice." In United Medical Laboratories v. Columbia Broadcasting System, Inc., *supra,* 404 F.2d at 710, the Court in discussing the *New York Times* rule stated that "the fundamental basis on which all of the Court's First Amendment thrusts into the various fields thus far presented has rested [upon] the right of the public to have an interest in the matter involved and its right therefore to know or be informed about it." See also Dacey v. Florida Bar, Inc., (C.A. 5) 427 F. 2d 1292 (1970); Wasserman v. Time, Inc., *supra;* Kerns v. McWilliams (C.A. 5) 435 F.2d 1306 (1971); Time, Inc. v. Johnston, *supra;* Cerrito v. Time, Inc. (C.A. 9) 449 F.2d 306 (1971); Gospel Spreading Church v. Johnson Publishing Co., *supra;* Alexander v. Lancaster (W. D.La.) 330 F.Supp. 341 (1971); McFarland v. Hearst Corp. (D.Md.) 332 F. Supp. 746 (1971). See also Time, Inc. v. Hill, 385 U.S. 374, 387–388, 87 S.Ct. 534, 17 L.Ed.2d 456 (1967). "A person may become the subject of public interest within the meaning of that rule, although he does not seek to be one, and indeed attempts to avoid it." David v. National Broadcasting Co., *supra,* 320 F.Supp. at 1073.

■ The "public interest" is at once an expansive yet elusive concept. "Certainly discrete events of current interest are entitled to the protection of newsworthiness, but so are matters of more general scope, such as unemployment, the problems of the aged, hospital care, and . . . organized crime." Goldman v. Time, Inc. (N.D.Cal.) 336 F. Supp. 133, 138 (1971). The Court in United Medical Laboratories v. Columbia Broadcasting Systems, Inc., *supra,* found that the practices of mail-order clinical testing laboratories were within the general public interest in the public health area. See also Time, Inc. v. Hill, *supra,* in which the Court found that the actual malice standard was applicable to a re-

view of a play which was falsely identified as being based on an actual crime and the victims identified. The Court in Goldman v. Time, Inc., *supra,* 336 F. Supp. at 138, found three factors to be instrumental in determining whether a publication is within the "public interest": (1) the social values of the facts published; (2) the depth of the article's intrusion into ostensibly private affairs; and (3) the extent to which the party voluntarily acceded to a position of public notoriety. The Court added this caveat: "The right of the public to know, and of the media to tell, is so deeply entrenched in the American conscience that a great deal of latitude must necessarily be afforded the media in its selection and presentation of news." It does not destroy the constitutional protection where the subject matter is only of local interest, if it is addressed to the interested community. Rosenblatt v. Baer, 383 U.S. 75, 86 S.Ct. 669, 15 L.Ed.2d 597 (1966). See also Arizona Biochemical Co. v. Hearst Corp. (S.D.N.Y.) 302 F. Supp. 412, 414 (1969).

Certainly it can be said that the subject matter of the broadcasts and wire releases under review here is of considerable public interest. The public has a vital interest in organized crime. In Cerrito v. Time, Inc. (N.D.Cal.) 302 F. Supp. 1071 (1969), aff'd per curiam (C. A. 9) 449 F.2d 306 (1971), the Court stated at 1073:

> There can be no doubt that organized crime is a subject about which the public has an interest and a right to be informed. The vast expenditures of money by all branches of government, both state and federal, into the workings and extent of organized crime indicates the interest of the public, as well as its right to know or be informed.

Plaintiff has acknowledged the public interest in organized crime.

■ We find that the subject matter of the disputed broadcasts and wire releases is within the public interest; and, therefore, the constitutional guarantees

of the First Amendment as enunciated in New York Times Co. v. Sullivan, *supra*, and Rosenbloom v. Metromedia, Inc., *supra*, are applicable here.

■ Therefore, this action to recover for defamation may be sustained only upon clear and convincing proof that the defamatory falsehood was published with knowledge that it was false or with reckless disregard of whether or not it was false. Treutler v. Meredith Corp. (C.A. 8) 455 F.2d 255, 259 (1972). See also Time, Inc. v. Hill, *supra*, 385 U.S. at 390, 87 S.Ct. 534, 17 L.Ed.2d 456. The showing of malice may not be presumed but is a matter for proof by the plaintiff. Time, Inc. v. McLaney, *supra*, 406 F.2d at 572. Moreover, the bare allegation of malice, standing alone, is not sufficient to withstand a motion for summary judgment. Goldman v. Time, Inc., *supra*, 336 F.Supp. at 138.

■■ The character and content of the publication is a constitutionally impermissible evidentiary basis for the finding of actual malice. Washington Post Co. v. Keogh, 125 U.S.App.D.C. 32, 365 F.2d 965 (1966), cert. denied 385 U.S. 1011, 87 S.Ct. 708, 17 L.Ed.2d 548. Malice cannot be deduced from the mere fact of publication alone. Hurley v. Northwest Publications, Inc. (D.Minn.) 273 F.Supp. 967 (1967), aff'd 398 F.2d 346 (C.A. 8 1968).

■ In Hensley v. Life Magazine, Time, Inc., *supra*, 336 F.Supp. at 52, the Court stated:

> Accordingly, it has been held that when a motion for summary judgment is made by a defendant in a libel action, based upon the ground, supported by affidavits, of lack of actual malice in the publication of material concerning a matter of public or general interest, the burden rests upon the plaintiff to make an affirmative evidentiary showing that there is a genuine issue of fact as to the material matters involved.

The truth or falsity of the statements is not the constitutional test; the statements must be published with actual knowledge of their falsity or with reckless disregard for their falsity. Bon Air Hotel, Inc. v. Time, Inc., *supra*, 426 F.2d at 867. In Garrison v. Louisiana, *supra*, 379 U.S. at 79, 85 S.Ct. at 218, the Court concluded: "The test which we laid down in *New York Times* is not keyed to ordinary care; defeasance of the privilege is conditioned, not on mere negligence, but on reckless disregard for the truth." See also Time, Inc. v. Hill, *supra*, 385 U.S. at 389 and 396, 87 S.Ct. 534; Alexander v. Lancaster, *supra*, 330 F.Supp. at 349; Time, Inc. v. Pape, 401 U.S. 279, 291, 91 S.Ct. 633, 28 L.Ed.2d 45 (1971).

■ Reckless disregard of the truth or falsity of a statement has been defined as an awareness of the likelihood of the circulation of false information or a high degree of awareness of probable falsity. St. Amant v. Thompson, 390 U.S. 727, 731, 88 S.Ct. 1323, 20 L.Ed.2d 262. The cases are clear that reckless conduct is not measured by whether a reasonably prudent man would have published or would have investigated before publishing. "There must be sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication. Publishing with such doubts shows reckless disregard for truth or falsity and demonstrates actual malice." St. Amant v. Thompson, *supra* at 731, 88 S.Ct. at 1325; Rosenbloom v. Metromedia, Inc., *supra*, 403 U.S. at 56, 91 S.Ct. 1811. Reckless disregard has also been defined as an "extreme departure from the standards of investigation and reporting ordinarily adhered to by responsible publishers." Curtis Publishing Co. v. Butts, *supra*, 388 U.S. at 158, 87 S.Ct. at 1993; McFarland v. Hearst Corp., *supra*, 332 F.Supp. at 749. Investigatory failures alone are not sufficient to establish reckless disregard. Curtis Publishing Co. v. Butts, *supra*; St. Amant v. Thompson, *supra*, 390 U.S. at 733, 88 S.Ct. 1323; New York Times Co. v. Sullivan, *supra*, 376 U.S. at 287–288, 84 S.Ct. 710.

Plaintiff's claim is that he was libeled by the AP when the AP disseminated over its wire service that plaintiff was a member of the Mafia and had made a trip to Miami, Florida on March 1, 1969 for the purpose of attending a Mafia convention. Plaintiff contends that J. Dennis Friel, who prepared the allegedly libelous wire releases, "wrote his articles with a knowledge of their falsity or in reckless disregard of whether they were true or false."

Plaintiff argues that actual malice on the part of AP is shown through the following facts. First, Friel deleted a portion of Plowden's original draft, while retaining other portions. Plowden's introductory paragraph had read:

Fourteen men from Kansas City, described *as including Mafia members* and their associates, were greeted with subpoenas Saturday, calling for their appearance before a federal grand jury. [Emphasis plaintiff's.]

The italicized phrase was changed by Friel, and in subsequent articles the men from Kansas City were treated as a unit. Plaintiff further contends that the portions of Plowden's draft that Friel retained were included for the reason that "We suspect Friel left this in because it was 'sensational' type material and fit in well with Friel's fabrication of a sensational article on a large scale meeting of fifteen Mafia members from Kansas City."

Related to this contention is plaintiff's suggestion that AP's failure to distinguish between members and non-members of the Mafia when information in this regard was available is evidence of actual malice. Friel did not inquire of any of his sources whether or not plaintiff was a member of the Mafia.

The depositions and affidavits reveal that Friel's sources identified the Kansas City group as a unit and did not distinguish between Mafia members and non-members in the group. Friel testified that he had edited Plowden's draft because none of of his sources distinguished the members from non-members,

and that he contacted his sources subsequent to Plowden's story and believed that they were more accurate. Moreover, Friel's failure to question his sources as to plaintiff's membership or non-membership in the Mafia is evidence that he entertained no serious doubts as to the truth of the information he received from his sources.

In Time, Inc. v. Pape, *supra*, there was an article written summarizing a commission's report on police brutality. The article quoted portions of a complaint filed in federal court, and the quoted sections were not distinguished from the commission's report. Further, the article did not describe the events as "allegedly" occurring. The Supreme Court held, at 401 U.S. 290, 91 S.Ct. 633, that the omission of the word "alleged," though it arguably reflected a misconception, was insufficient to create a jury issue of actual malice under the *New York Times* rule. Although the scope of this holding is limited, it is applicable to plaintiff's contention in regard to Friel's editing of Plowden's draft.

Plaintiff cites Time, Inc. v. Ragano (C.A.5) 427 F.2d 219 (1970), and Wasserman v. Time, Inc., *supra*, in support as his argument that AP knowingly and with reckless disregard described plaintiff as a Mafia member by association with known Mafia members. These two cases, which grew out of the same article, are readily distinguishable on their facts. Therein, it was undisputed that Time knew that both men were attorneys for other men in the group referred to in the article and were not one of those called before the grand jury and released on $100,000 bail. There is no evidence in this case that AP knew that plaintiff was not associated with the Mafia.

██ Moreover, mere suspicion and speculation that the releases were fabricated is insufficient to establish actual malice. There must be evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of the publication. St. Amant v. Thompson, *supra*.

Further, plaintiff contends that the depositions of Earle and Koste reveal that neither told Friel that all 15 men were Mafia members or that they were in Miami for a meeting or convention of La Cosa Nostra; and that the information furnished to the Justice Department attorneys did not identify plaintiff as a member of the Mafia. Plaintiff also states that Carter's deposition reveals that he did not identify anyone in the Kansas City group as a member of the Mafia, nor did he allege that the men were there to attend an underworld convention. Consequently, plaintiff argues, "Friel's testimony is contradicted so thoroughly by his admitted sources that actual malice is clearly a question of fact which should be submitted to the jury."

The affidavits of Earle and Koste reflect that both men found the AP dispatches to be accurate and to reflect the facts at the time as they knew them. In his deposition, Earle admitted that he could have identified the Kansas City group as Mafia members and their associates. The deposition, written statement and TV interview with Carter clearly reflect that his statements were not fabricated, but were, in fact, accurately reported.

AP has come forward with affirmative evidence that no actual malice or no reckless disregard as to the truth or falsity of their dispatches existed. In fact, the defendant's evidence shows that there was not even negligence on its part. There is a complete absence of any indication that Friel had any suspicion of the falsity of the statements made by him, and there is a total lack of proof on plaintiff's part that Friel had before him any contra-indications as to the correctness of his story.

Although plaintiff has been provided ample opportunity to come forth with factual data, he has provided no factual support which would buttress a jury's determination that actual malice existed. As stated in Hurley v. Northwest Publications, Inc., *supra*, 273 F.Supp. at 974:

Plaintiff's mere hope that somehow or other on cross examination credability [sic] of a witness . . . can be put in issue is not sufficient to resist a motion for summary judgment. A mere chance that somehow, somewhere, on cross examination or otherwise plaintiffs will uncover something which might add to their case but obviously of which now they have no knowledge, is mere speculation and conjecture and is not sufficient in view of the showing made here by the defendant.

In the face of a motion for summary judgment, in order to be entitled to proceed, plaintiff is required to show that he has "sufficient probative substance to be able litigably to give rise to an issue of fact on whether such malice actually existed or not." United Laboratories v. Columbia Broadcasting Systems, Inc., *supra*, 404 F.2d at 712; Alexander v. Lancaster, *supra*, 330 F.Supp. at 349.

Certainly it cannot be said of the conduct with respect to motivation that the complaint herein meets the required standards. The intent was not merely to injure through falsehood; rather the motivation was the protection of the public in the disclosure of a highly important matter affecting the public interest. The record fully developed by affidavits and depositions demonstrates that no proof of actual malice has been adduced that has "the convincing clarity which the constitutional standard demands." New York Times Co. v. Sullivan, *supra*, 376 U.S. at 286, 84 S.Ct. at 729; Time, Inc. v. McLaney, *supra*, 406 F.2d at 572. That requisite showing of malice or reckless disregard for the truth or falsity of the words used is entirely absent in this cause.

"Unless the court finds, on the basis of pretrial affidavits, depositions or other documentary evidence, that the plaintiff can prove actual malice in the *Times* sense, it should grant summary judgment." Bon Air Hotel, Inc. v. Time, Inc., *supra*, 426 F.2d at 864; Wasserman v. Time, *supra*, 138 U.S.App.D.C. 7,

424 F.2d at 922. The record herein clearly indicates that plaintiff is unable, as a matter of law, to discharge the burden imposed on him of proving that he was mentioned in the article with actual malice or with knowledge that the statements were false or with reckless disregard of whether they were false or not. Accordingly, summary judgment will be granted in favor of the defendant AP.

Plaintiff contends that defendants Metromedia and Meredith are not entitled to summary judgment under the authorities cited above for the reason that when the defendants:

> received the broadcasts from the national services, serious doubts were raised as to the truthfulness of the allegations. The stations therefore exhibited actual malice by providing a local outlet for the libelous accusations about plaintiff who was a Kansas City resident and would be greatly damaged by local television broadcasts.

Plaintiff's contention is that the defendants did have serious doubts as to the truthfulness of statements that plaintiff was a member of the Mafia and was in Miami to attend a Mafia convention because:

> The general circumstances surrounding the mass subpoena party in Miami should have indicated to members of the media in Kansas City that it was very likely that innocent people would be brought into such an investigation for testifying purposes. This has been the well-known history of similar investigations such as the McClellan and Kefauver hearings, and the media know the general tenor of such investigations, including the fact that many innocent people are subpoenaed in an attempt to determine who guilty parties are (Friel 65–66).

Since a serious doubt was raised, plaintiff contends, defendants were under a duty to seek verification from local law enforcement agencies, instead of relying solely on the wire releases. Further, plaintiff states that defendant Meredith has admitted on answers to interrogatories that before a story about a local citizen involved in unlawful activities is broadcast, investigation should be made.

In view of the serious doubts raised and the indication of proper journalistic procedure, plaintiff contends that actual malice has been shown.

Plaintiff has come forth with no evidence of actual malice. Plaintiff is required to show with convincing clarity that defendants in fact entertained serious doubts as to the truth or falsity of the publication. Plaintiff has not done so.

The suggestions of the plaintiff are replete with speculation and conjecture, and constitute little more than a repleading of the allegations of his complaint. Plaintiff has completely failed to carry his burden.

For the reasons discussed above in regard to the AP's motion for summary judgment, and for the foregoing reasons, summary judgment on behalf of defendants Metromedia and Meredith must be granted. Bon Air Hotel, Inc. v. Time, Inc., *supra*, 426 F.2d at 864.

It is therefore

Ordered, adjudged and decreed that the defendants' separate motions for summary judgment be, and they are hereby, granted, and judgment is entered for the defendants on plaintiff's complaint; and

Ordered that the costs of this action be taxed against the plaintiff.