Henry M. **BUCHANAN** and Henry M. **Buchanan, C.P.A., P.A., Plaintiffs,**

v.

**ASSOCIATED PRESS and Steven Cohen, Defendants.**

Civ. A. No. 74-323.

United States District Court, District of Columbia.

June 23, 1975.

Michael L. Glaser, Glaser & Fletcher, Jerry C. May, Washington, D. C., for plaintiffs.

John M. Liftin, Roger A. Clark, John H. C. Barron, Jr., Washington, D. C., for defendants.

## MEMORANDUM OPINION

FLANNERY, District Judge.

This matter is before the court on defendants' motion for summary judgment and plaintiffs' opposition thereto. The court has considered the extensive memoranda, exhibits, and depositions submitted by counsel and has heard oral argument. This case involves an alleged libel and invasion of privacy based upon an Associated Press wire report of a judicial hearing. For the reasons set forth in this Memorandum Opinion, defendants' motion should be granted.

*I. Factual Background*

Counsel have set forth in their papers most of the relevant factual background in this case. Thus, the following will be only by way of summary. Plaintiff Henry M. Buchanan is a certified public accountant with offices in Bethesda, Maryland. Plaintiff Henry M. Buchanan, C.P.A., P.A., is a professional association of accountants of which Mr. Buchanan is the principal shareholder and president. In March, 1971 Mr. Buchanan and his firm were retained to perform accounting services for the Finance Committee to Re-elect the President. Thereafter Mr. Buchanan and his firm assisted the Committee in setting up its charge of accounts, books of account, and its disbursements journal and assisted generally in its overall accounting system. Mr. Buchanan also on several occasions advised the Committee when reports of expenditures and contributions by political committees were required to be filed under the Federal Corrupt Practices Act. Mr. Buchanan and his firm also allowed the Committee to use Mr. Buchanan's agency account for purposes of making disbursements. The Committee sent Mr. Buchanan four checks totalling $11,000. He deposited these checks in the agency account and thereafter withdrew sums of money or drew checks on the account. Then he would give the Committee the checks that had been drawn or the cash he had withdrawn. Mr. Buchanan was told that some of the checks he gave to the Committee were to supplement the salary of a certain Committee employee and that other checks were to pay invoices. However, he was never told and never asked the purpose of the cash which he forwarded to the Committee.

During the entire pre-1972 election period there was extensive public interest in the problem of campaign financing. Under the existing law and under the law as amended, 2 U.S.C. §§ 242, 243 (1970), *repealed,* Pub.L. 92–225, tit. IV, § 405, 86 Stat. 20 (1972), 2 U.S.C. § 432 (Supp.1975), records had to be kept of virtually all campaign contributions and of all campaign expenditures. Criminal penalties were provided for violation of these provisions. *See* 2 U.S.C. § 252 (1970); *id.* § 441 (Supp.1975).

In 1972 Common Cause brought suit, *Common Cause v. Finance Committee to Re-elect the President,* Civil Action No. 1780–72 (D.D.C.), to force the Finance Committee to report its contributions and expenditures during the period prior to April 7, 1972. It brought this suit under the Federal Corrupt Practices Act of 1925, 2 U.S.C. § 241 *et seq.* Expenditures and contributions occurring after April 7, 1972 were covered by the

Federal Election Campaign Act of 1971, 2 U.S.C. § 431 *et seq.* which repealed the previous law. In the course of discovery in the *Common Cause* suit, Common Cause discovered that Mr. Buchanan had served as an accountant for the Finance Committee during the pre-April 7, 1972 period. Thus, Common Cause noted and took his deposition. The deposition revealed the type of accounting services that Mr. Buchanan had performed for the Finance Committee. In particular, the deposition revealed that on a number of occasions the Finance Committee had requested Mr. Buchanan to cash checks written on funds in his agency account, funds which previously had been supplied to him by the Finance Committee. Mr. Buchanan would cash the checks and send the cash to the Finance Committee. He admitted that he was a little disturbed by this procedure but that he complied with the request because he finally determined that there was no impropriety. Nevertheless, this was a strange procedure for the Finance Committee, especially since the Committee readily could have cashed checks itself at the bank in its own building rather than have its agent cash checks in Maryland and send the cash by messenger to downtown Washington. At one point Mr. Buchanan guessed that one purpose of this arrangement was to prevent the press from tracing the source of certain Committee funds.

The day after Mr. Buchanan was deposed in the *Common Cause* suit he, through his attorney, filed a motion for a protective order before Judge Joseph Waddy, seeking to have the deposition sealed. His reasoning was that disclosure of the contents of the deposition could only cause embarrassment to him. Pursuant to his motion a hearing was held and the Associated Press on May 8, 1973 issued a wire release concerning that hearing. The wire release read as follows:

WASHINGTON AP—The Nixon re-election committee used a Bethesda, Md., accounting firm to convert campaign checks into cash during 1971, it was revealed in U. S. District Court today.

In a hearing before Judge Joseph C. Waddy, it was disclosed that the firm converted 11 checks into cash and turned them back to the campaign committee.

It was the second revelation of checks being converted to cash and then fed back to the campaign. The earlier case involved $114,000 which passed through the Miami bank account of convicted Watergate conspirator Bernard L. Barker.

The hearing today was in connection with a deposition given by Henry Buchanan, head of the accounting firm which handled the books of the Finance Committee to Re-elect the President.

Buchanan's attorneys asked the court to keep under seal a deposition given by Buchanan in a suit filed by Common Cause, a citizen's group trying to force disclosure by the Nixon committee of pre-April 1972 contributions and expenditures.

Waddy deferred a decision until he reads the deposition.

But also disclosed during the hearing was that the accounting firm cashed five checks to supplement the salary of someone on the re-election committee staff and it cashed another three checks to pay invoices.

Both sides agreed to keep under seal Buchanan's testimony relative to these eight checks.

Kenneth Guido, lawyer for Common Cause, said after the hearing he did not know why the committee used Buchanan to cash the checks or what the cash returned to the committee was used for.

Other depositions in the case have revealed that the committee raised up to $2 million in untraceable cash before April 7, 1972. Part of the money converted through Barker's bank account was traced to the men who bur-

glarized and bugged the Democratic Party Headquarters in the Watergate office building last year.

Mr. Buchanan and his attorney immediately protested to Associated Press that its wire story was false, misleading and libelous. After further checking the Associated Press on May 14, 1973, requested all newspapers which carried the original wire to publish the following corrective wire:

WASHINGTON AP—The Associated Press reported erroneously Tuesday that proceedings in a federal court hearing disclosed that the Nixon re-election committee used the accounting firm of Henry M. Buchanan to convert campaign checks into cash during 1971.

A court transcript shows that no such disclosure was made during the hearing on a motion by Buchanan to keep sealed a deposition he gave in a suit filed by Common Cause against the Nixon committee.

The Bethesda, Md., firm used a trust account, with funds provided by the Finance Committee to Re-elect the President, to supplement the salary of an unnamed committee employee and to pay by checks "certain individuals for service the individuals had rendered," according to the transcript.

U. S. Dist. Court Judge Joseph C. Waddy asked Buchanan's lawyer if the committee directed what expenditures should be made.

Buchanan's lawyer: "That is correct, except in several instances—I don't recall how many—there were certain checks which my client was asked to cash.

"He drew them to himself or to 'cash.' He endorsed them and negotiated them.

"He was immediately instructed to furnish the proceeds of the checks to the defendant, which he did.

"There were 19 expenditures in all during that period, between July and December of 1971."

Asked by Waddy if the sealed depositions disclosed "the names and addresses of contributors to political committees," Buchanan's attorney replied, "Not contributors, Your Honor, expenditures."

Common Cause, the self-styled citizens' lobby, seeks in federal court to force disclosure by the Nixon committee of contributions and expenditures before April 7, 1972, when the new federal campaign finance law went into effect.

Buchanan's attorney said making public his client's deposition would be embarrassing and an annoyance and would disclose "discussion of a confidential relationship between my client and the defendant."

Waddy deferred a decision until he reads the deposition.

It is the publication of the May 8, 1973 wire which plaintiffs allege to be a libel and an invasion of privacy. Plaintiffs allege that the Associated Press' May 8, 1973 wire report implies that plaintiffs converted campaign contribution checks to cash in violation of federal law. This implication allegedly is made stronger by the comparison to the Barker affair which did involve campaign contribution checks. Plaintiffs assert that defendants should have reported that campaign expenditure checks, not contribution checks, were involved in the case. In sum, plantiffs assert that the story as reported was false and that they can recover for the libel and invasion of privacy on two grounds. First, they allege that there is sufficient evidence for a jury to infer that the publication was made with malice under the *New York Times v. Sullivan*, 376 U. S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964) standard. Second, they allege that Mr. Buchanan was neither a public official nor a public figure and thus under *Gertz v. Robert Welch, Inc.*, 418 U. S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974), they can recover under a standard of proof less demanding than set forth under *New York Times v. Sullivan*.

■ The instant motion for summary judgment by defendants presents a number of issues. First, defendants assert that despite their corrective wire report of May 14, 1973, this court should rule that the May 8, 1973 wire report is a substantially accurate report of a judicial proceeding and thus is not actionable. Second, defendants assert that even if the report was not accurate, Mr. Buchanan is a public figure and thus actual malice must be shown before liability can attach. Defendants urge that there is no showing of any evidence from which such malice could be inferred and thus that they are entitled to summary judgment. Finally, even if Mr. Buchanan were not a public figure, defendants urge that under applicable District of Columbia law, this court should apply the actual malice standard and grant defendants summary judgment. The court will deal with the first two assertions in turn; it is unnecessary to reach the third one.

I.  *Whether the May 8, 1973 Wire was a Substantially Accurate Report.*

The Restatement, Second of Torts § 611 (Tent.Draft 21, Apr. 5, 1975) provides:

> The publication of defamatory matter concerning another in a report of any official proceeding or any meeting open to the public which deals with matters of public concern is conditionally privileged if the report is accurate and complete, or a fair abridgement of what has occurred.

The privilege is conditional and is lost when the publisher does not give a fair and accurate report of the proceeding. *Id.* Comment *b.*

> The reporter is not privileged under this Section to make additions of his own which would convey a defamatory impression, nor to impute corrupt motives to any one, nor to indict expressly or by innuendo the veracity or integrity of any of the parties.

*Id.* Comment *f.* Defendants make the following argument:

■

The hearing transcript shows (a) that plaintiff was provided campaign funds by the Committee which he deposited in his agency account, (b) that plaintiff drew checks on the campaign funds in his agency account at the direction of the Committee, and (c) that plaintiff cashed the checks and returned the cash proceeds to the Committee as he was requested to do by the Committee. In light of these revelations, AP's characterization of the checks which Buchanan cashed as "campaign checks" was both accurate and appropriate.

Memorandum of Points and Authorities in Support of Motion for Summary Judgment by Defendants Associated Press and Steven Cohen, at 25, filed March 10, 1975. Plaintiffs, in essence, make two arguments against defendants' contentions: (1) that the failure to explicitly distinguish between campaign expenditures and campaign contribution checks made the wire report inaccurate and defamatory; and (2) that the addition of the comparison with the Barker affair is an addition which conveys a defamatory impression.

■ The court has reviewed with care the transcript of the hearing before Judge Waddy to determine whether those parts of the wire report specifically referring to that hearing are accurate and complete or a fair abridgment. The court finds it immaterial whether the campaign checks referred to in the report were expenditure checks or contribution checks—failure to properly record and report matters pertaining to both contributions and expenditures are violations of federal law. Further, the hearing itself was not altogether clear as to precisely the contents of the deposition. Under all of these circumstances, the court concludes that no genuine issue of material fact exists and that the report of the judicial proceedings with its reference to campaign checks was accurate and a fair abridgment of those proceedings.

■ However, the Associated Press did not merely report the judicial hearing. Rather, AP compared the matters concerning Mr. Buchanan with those widely reported concerning Mr. Barker. Such an addition does not come within the conditional privilege of section 611. The court concludes that a factual issue exists regarding whether the addition of the Barker analogy makes the entire wire report defamatory, false and outside of the privilege. *See Carey v. Hume,* 390 F.Supp. 1026, 1029 (D.D.C. 1975).

II. *Whether The New York Times v. Sullivan Standard Applies in this Case.*

For purposes of this aspect of the instant motion, the court will assume that the wire report does not constitute an accurate report of the judicial proceedings and that it is defamatory in nature. The court, however, must consider on this motion what standard of proof would apply at trial on this issue.

■ Defendants argue that plaintiffs, because of their involvement in matters of great public concern, are public figures and that the standards of *New York Times v. Sullivan, supra,* must apply to the defamatory statements. Public Figure status may be achieved in two ways.

> In some instances an individual may achieve such pervasive fame or notoriety that he becomes a public figure for all purposes and in all contexts. More commonly, an individual voluntarily injects himself or is drawn into a particular public controversy and thereby becomes a public figure for a limited range of issues.

*Gertz v. Robert Welch, Inc., supra* 418 U.S. at 351, 94 S.Ct. at 3013. In the instant case defendants claim that Mr. Buchanan became a public figure only in the second way—that is he actively participated in and was further drawn into a particular public controversy of great national interest. The question then is whether given the nature and extent of Mr. Buchanan's participation in the controversy of the Finance Committee's accounting for contributions and expenditures, the court should deem him a public figure. *Id.* at 351-52, 94 S.Ct. 2997.

■ In considering whether Mr. Buchanan is a public figure the court first states that the controversy over the financing of the campaign for the election of the United States President was a matter of the greatest public concern. As the Supreme Court recently reiterated, anything that concerns an official's fitness for office is a legitimate matter for public concern. *See id.* at 344-45, 94 S.Ct. 2997. *See also Monitor Patriot Co. v. Roy,* 401 U.S. 265, 272-73, 275 (1971); *Oscala Star-Banner Co. v. Damron,* 401 U.S. 295, 300-01 (1971); *New York Times v. Sullivan, supra* 376 U.S. at 279, 84 S.Ct. 710; *Thompson v. Evening Star Newspaper Co.,* 129 U.S.App. D.C. 299, 394 F.2d 774, *cert. denied,* 393 U.S. 884, 89 S.Ct. 194, 21 L.Ed.2d 160 (1968). All of these cases—and others —demonstrate that the public interest in complete and uninhibited reporting of all events relating to the American political process is very compelling.

■ The court concludes that Mr. Buchanan's involvement in the area of the Finance Committee's accounting for various transactions relating to the re-election of former President Nixon is such that he must be classified as a public figure for purposes of this law suit. It is undisputed by the parties that there was intense public interest in the public finance and spending practices of campaign committees at the time Mr. Buchanan was working for the Committee. He, of course, knew of this public interest. He significantly assisted the Committee in setting up its accounting system—a system that was a legitimate area of public scrutiny, particularly given disclosures of irregularities in a variety of matters. And he assisted the Committee in making a series of cash transactions whose purpose he did not know. These cash transactions also were matters of legitimate public con-

cern given the federal requirement calling for accurate accounting of all Committee expenditures. Mr. Buchanan was a key person in efforts to investigate this unusual, if legal, accounting practice. In this aspect of his work with the Committee, he was standing in an agency relationship with the Committee. Since the Committee was surely the legitimate object of searching public scrutiny, its agents, particularly those handling cash transactions at a time when money transactions were extremely suspect, also must be examined carefully and come within the area of great public concern. *See Time, Inc. v. McLaney*, 406 F.2d 565, 573 (5th Cir.), *cert. denied*, 395 U.S. 922, 89 S.Ct. 1776, 23 L. Ed.2d 239 (1969). In this aspect Mr. Buchanan volunteered his services—he willingly accepted his accountant's role. In fact, at one point he agreed to assist further the Republican effort by becoming a chairman of a small campaign committee. While his role as campaign committee chairman did not last long and involved little activity, it demonstrates Mr. Buchanan's willingness to become a part of an area of intense public concern. In sum, given his extensive involvement with the Finance Committee, his willingness to participate and assist the Committee in any way they requested, and the intense public interest in the precise activities in which he participated, the court must conclude that Mr. Buchanan justly is classified as a public figure for the purposes of this suit.[1]

■■ Since plaintiff is a public figure, in order to recover he must prove with convincing clarity that the AP report was made with actual malice, that is "with knowledge that it was false or with reckless disregard of whether it was false or not." *New York Times v. Sullivan, supra* 376 U.S. at 279–80, 84

S.Ct. at 726. To prove reckless disregard for the truth the Court has stated:

> [R]eckless conduct is not measured by whether a reasonably prudent man would have published, or would have investigated before publishing. There must be sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication.

*St. Amant v. Thompson*, 390 U.S. 727, 731–32, 88 S.Ct. 1323, 1325, 20 L.Ed.2d 262 (1968). In meeting this burden due regard must be given to the difficulties involved in contemporary or spot news reporting. *Associated Press v. Walker*, 388 U.S. 130, 158–59, 87 S.Ct. 1975, 18 L.Ed.2d 1094 (1967).

■ Plaintiffs urge that they have presented sufficient evidence so that this court must conclude that genuine issues of material fact remain in dispute so that trial on the merits must be had. Plaintiffs take two somewhat inconsistent positions for purposes of this motion. Both positions must be rejected. First, it is the testimony of the AP reporter, Mr. Cohen, that he arrived at the judicial hearing late but heard most of the proceedings. Then Mr. Cohen testified that he talked with the Common Cause attorney, Mr. Guido, and with Leslie Stahl, a CBS reporter, to find out if he had missed anything. Thereafter, he reported the story to AP. AP's office man, Mr. McLeod, has testified that he also checked with the Common Cause attorney by phone in order to verify certain details in the story. Plaintiffs argue that if defendants were present and did, in fact, check out the story, they must have learned that campaign expenditures were involved and that the story was not similar to the Barker case at all. There is a serious flaw in plaintiffs' reasoning. They have the burden

---

1. The Supreme Court in *Gertz* reiterated that one additional factor which may be considered in analysis of whether a person properly is classified as a public figure is his access to the media to seek correction of any misstatements. 418 U.S. at 344, 94 S. Ct. 2997. Here, Mr. Buchanan rapidly sought and obtained corrections from both AP and CBS and later articles described his claims of falsity. These are added indications that Mr. Buchanan should be classified as a public figure.

of proving by clear and convincing evidence that the report was published with actual malice. The evidence just described does not come even close to meeting the actual malice standard. There first of all is no proof that defendants focused on whether the checks involved campaign contributions, campaign expenditures, or something else. It appears undisputed that defendants concentrated on the fact that cash was returned to the campaign committee in a transaction which was similar, at least in this regard, to that involving Mr. Barker.[2] Further, the record is without dispute that almost all the reporters who were present at the hearing were very confused about precisely what was going on. Mr. Guido has testified that he was repeatedly asked questions demonstrating that confusion was widespread. Further, the AP reporter, from the nature of his assignment, was operating under severe time restraints. Given the unshaken testimony of the AP reporters, the lack of evidence that they focused on the distinctions plaintiffs feel are important, and given further the widespread confusion and time restraints, this court concludes as a matter of law that plaintiffs have failed to demonstrate facts upon which they could prove their claim of actual malice with convincing clarity.

■ Plaintiffs' second position regarding proof of malice is as follows. Defendants would testify without dispute that Mr. Cohen was present at the hearing, that he spoke with Mr. Guido and Ms. Stahl thereafter, and that Mr. McLeod later also spoke with Mr. Guido to clarify certain facts. Defendants would testify that they learned nothing that made them doubt the accuracy or truth of the wire report. Plaintiffs would introduce evidence that Mr. Guido cannot recall whether he spoke with Mr. Cohen or Mr. McLeod after the hearing and that he cannot recall seeing Mr. Cohen at the hearing. Ms. Stahl would testify that she cannot recall seeing Mr. Cohen at the hearing or precisely when she spoke with him after the hearing. Plaintiffs' counsel has proffered further that he cannot recall seeing Mr. Cohen at the hearing. From this evidence plaintiffs aver that there is a factual dispute regarding whether defendant Cohen was present at the hearing and whether Mr. Cohen and/or Mr. McLeod did anything to check the accuracy of the report they filed. Plaintiffs then assert that if the jury found that Cohen was not present at the hearing and that AP did nothing to check the report's accuracy, from these findings the jury may infer actual malice. There are two answers to plaintiffs' contentions. First, in face of the unshaken testimony of defendants, the mere failure to recall seeing or talking with a person, under the circumstances of this case, does not create a genuine issue of material fact. The courtroom was crowded on the day of the hearing and after the hearing Mr. Guido talked with many reporters. No one has testified that he or she would have recalled Mr. Cohen if he had been there or if he had spoken with him. Indeed, Mr. Guido doubts whether he would recognize Mr. Cohen at all. Under these circumstances plaintiffs cannot prove with clear and convincing evidence that Cohen and McLeod published the report without minimal checking. Second, even if defendants failed to undertake any checking of their sources, then somehow they received information on the story. Perhaps, according to this theory of plaintiffs Cohen got the story from Ms. Stahl when he spoke with her after the hearing. At any rate, finally the AP reporters got the story and published it. Under these circumstances, however, there is no proof that the AP reporters knew the story was false. And further, there is no convincing proof that the AP conduct constituted

---

2. Defendants properly point out that the *Washington Evening Star*, though correctly labeling the transactions as involving expenditures, also compared the cash aspects with those of Mr. Barker. *Washington Evening Star*, May 9, 1973.

reckless disregard for the truth, *i. e.* "that [AP or Cohen] in fact entertained serious doubts as to the truth of [its] publication." *St. Amant v. Thompson, supra* 390 U.S. at 731–32, 88 S.Ct. at 1325. "[R]eckless conduct is not measured by whether a reasonably prudent man would have published or would have investigated before publishing." *Id.* At most the AP story appears to be one of a number of possible rational interpretations of a confusing hearing. This is insufficient to create a jury issue on malice. *Time, Inc. v. Pape,* 401 U.S. 279, 290, 91 S.Ct. 633, 28 L.Ed.2d 45 (1971).

On this motion for summary judgment the court has undertaken to examine the factual assertions made by the parties to determine whether, taking the assertions in the light most favorable to plaintiffs, plaintiffs could meet their heavy burden of proof on the malice issue. The Court of Appeals for the District of Columbia Circuit has pointed out that summary judgment procedures are particularly relevant where first amendment issues are present because one of the purposes of that amendment is to protect the press from harassment, not merely from liability. *Washington Post Co. v. Keogh,* 125 U.S.App.D.C. 32, 365 F.2d 965, 968 (D.C.Cir.1966), *cert. denied,* 385 U.S. 1001, 87 S.Ct. 708, 17 L.Ed.2d 548 (1967); *accord, Treutler v. Meredith Corp.,* 455 F.2d 255, 257 n. 1 (8th Cir. 1972); *Bon Air Hotel, Inc. v. Time, Inc.,* 426 F.2d 858, 865 (5th Cir. 1970); *Thompson v. Evening Star Newspaper Co., supra.* And this Circuit further has urged that in considering a summary judgment motion the court is to look at the factual issues in light of the *Times* standard. "[E]vidence offered in a libel case might be sufficient to raise a jury question as to a publisher's negligence but insufficient to raise one as to his actual malice." *Washington Post Co. v. Keogh, supra* at 971; *La-Bruzzo v. Associated Press,* 353 F.Supp. 979, 982–88 (W.D.Mo.1973); *Bon Air Hotel, Inc. v. Time, Inc., supra* at 866–

67; *Time Inc. v. McLaney, supra* at 572; *Wasserman v. Time, Inc.,* 138 U.S.App. D.C. 7, 424 F.2d 920, 922 (1970), *cert. denied,* 398 U.S. 940, 90 S.Ct. 1844, 26 L. Ed.2d 273 (1970). Under the *Times* standard the court must make an independent examination of the whole record to assure that there has been no intrusion on free expression. *See Greenbelt Cooperative Publishing Ass'n v. Bresler,* 398 U.S. 6, 11, 90 S.Ct. 1537, 26 L.Ed.2d 6 (1970). After review of all of the evidence which would be introduced at trial —and the court notes that there has been exhaustive discovery such that the positions of the parties are clearly delineated—there would be no jury issue on malice. In such circumstances summary judgment is appropriate. An appropriate judgment accompanies this Memorandum Opinion.